Charles G. McDONALD, Plaintiff,

v.

BOARD OF MISSISSIPPI LEVEE COMMISSIONERS and Newman Bolls, Defendants.

Civ. A. No. GC 83–256–GD–O.

United States District Court,
N.D. Mississippi,
Greenville Division.

Oct. 22, 1986.

Charles R. Davis, Jackson, Miss., for plaintiff.

Stephen L. Thomas, Greenville, Miss., for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

The plaintiff, Charles G. McDonald, brings the instant action against the defendants, Board of Mississippi Levee Commissioners and Newman Bolls, asserting that the defendants have wrongfully deprived him of grazing rights on land that he owns. After hearing all of the testimony and reviewing all of the evidence, the court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure:

### Facts

The plaintiff herein, a Baton Rouge, Louisiana resident, is the fee simple owner of approximately 898 acres of land in Washington County, Mississippi. The plaintiff purchased this land, known as Palmetto Plantation property, by special warranty deed from United States Gypsum Company on April 8, 1982 for $325,000. This special warranty deed was made subject to easements that had been obtained by the Board of Mississippi Levee Commissioners.

The Defendant, Board of Mississippi Levee Commissioners (hereinafter "Levee Board"), was incorporated under act of the Mississippi Legislature in November of 1865. Section 3 of Chapter 1 of the Laws of 1865 defines the powers and duties of the Levee Board as follows:

Section 3. Be it further enacted, that the said Board of Levee Commissioners shall have full power, and it is hereby made their duty to rebuild, strengthen or elevate the old levee, or to make new embankments or levees, when they regard such to be necessary, in the Counties of Bolivar, Washington and Issaquena, which levees shall be constructed upon the Mississippi River front, or such other places as the Board may determine; they shall have power to employ all engineers and agents necessary for the work; they shall determine the base, height, slope and elevation of the levee, and may abandon any portion of the old levee, that they may regard as improperly built or unsafe and may build new levees, repair old, on such ground as they select, and make all needful regulations, and do all acts necessary in their opinion to secure the Counties under their charge from the

overflow of the waters of the Mississippi River.[1]

Section 17 of the 1865 Act vested in the Levee Board the power to condemn private property for the purpose of locating, constructing, repairing and maintaining the mainline levees on the Mississippi River. It provides in pertinent part:

Said Board of Levee Commissioners is hereby authorized to enter upon, take, use and appropriate, any property in said levee district for the purpose of constructing, maintaining and repairing its said levee in accordance with the provisions of this section....

Section 14 provides that the Board may contract with any person for the maintenance of any part of the levee.

Article 11, Section 227 of the Mississippi Constitution of 1890 mandates that "[a] levee system shall be maintained in the state as provided in this Article." Additionally, Article 11, Section 233 of the Mississippi Constitution of 1890 provides:

The Levee Board shall have, and are hereby granted authority and full power to appropriate private property in their respective districts for the purpose of constructing, maintaining and repairing levees therein....

The Levee Board asserts that pursuant to these constitutional and statutory provisions it acquired easements over 244 acres of the land now belonging to the plaintiff. The Board further alleges that these easements give it the right to exclusive control of the land on the levee, including the right to exclude the landowner from enjoying the grazing rights on the levee land.

The Levee Board's easements at issue were acquired pursuant to statutory condemnation proceedings under Section 17, Chapter 1, Laws 1865, as amended by Section 3, Chapter 169, Laws 1884, as further amended by Chapter 92, Laws 1904. The easement awards were given between 1899 and 1948. Most of these easement awards provide that the purpose of the easement is to enable the Levee Board to "build and repair a levee."

The original drafts of most of the documents used in making these awards provided that the purpose of the easement was only to "build" a levee. In most of the awards the word "repair" was inserted by writing the word "repair" above the word "build." In at least one other document the word "build" was crossed out and the word "repair" inserted above it. Some of the original drafts of the awards provide that the purpose of the taking is to "build, enlarge, and repair" the levee. The awards further provide that the commissioners on the Levee Board have determined the damages to the landowner, including the cash value of the land taken in building, repairing and enlarging the levee. The awards then contain a space where the commissioners listed what was taken to repair and enlarge the levee and the cash value of that which was taken. For example, one award provides that $15.00 per acre was the cash value of cleared land, $6.00 per acre was the value of woodland. Other awards provide that the value of fences, cabins and stores removed from the land was included along with the damage to adjacent property. At least one of the awards provides that the amount paid per acre of land taken would be a certain price per acre if the timber on the land were not taken but would be a different price per acre if the timber were taken. Another award sets the amount paid for the timber taken without setting a certain price per acre. Other awards just set a certain price for each acre taken and other damage without specifying what exactly was taken.

The purpose of grazing cattle on the levee land is to insure that the grass on the levee is kept at an acceptable height. The cattle graze the tall vegetation but leave a short sod on the ground, thus protecting the levee from erosion. The Levee Board asserts that taking away the landowner's right to graze cattle on the land subject to

---

1. It is specifically noted that the Levee Board was not empowered by the state constitution or the applicable statute to condemn or acquire the fee simple title to lands included in the levee.

the levee easement is necessary to properly maintain the levee.

The Levee Board has exercised control over the grazing rights on the subject land for at least 34 years. Since 1952, the Board has operated under a policy of granting maintenance contracts on the plaintiff's land to third parties. These contracts provide that the contractor will make sure that he has a proper number of cows grazing the land so as to keep a good sod on the land but is prohibited from grazing to such an extent that erosion becomes a problem. The contractor does not have to pay any money for the grazing privileges. Additionally, by entering these maintenance contracts, the Levee Board is able to keep its levee maintenance expenses at a minimum.

The Levee Board has granted maintenance contracts on two portions of the plaintiff's property. The first of the two current contracts is for the maintenance of the property from Station 5890 to Station 5982. This contract involves approximately 112 acres. The contract was granted to Cooper Farms, Inc. on August 25, 1980 and was to last for five years. The contract has expired, but the Levee Board is allowing Cooper Farms to continue grazing the levee pending the outcome of the instant suit.

Another maintenance contract was granted from Station 5982 to Station 6049 on the plaintiff's land. This contract covers approximately 132 acres of land and was granted to Thomas Fowlkes and Cooper Farms on August 13, 1981. This contract has also recently expired. Although both contracts have expired the Levee Board continues to assert complete authority over who will be allowed to graze cattle on the levee.

In the instant suit, the plaintiff claims that the Levee Board has no right to appropriate the grazing rights on the levee land that the plaintiff owns. He asserts that the Board has not acquired these rights by grant, condemnation, implication, or prescription. Further, the plaintiff asserts that the Levee Board's act of excluding

him from using the levee land constitutes a taking of the plaintiff's property without due process and just compensation.

Prior to purchasing the Palmetto Plantation property, the plaintiff engaged a Greenville, Mississippi law firm to conduct a title search of the land. The plaintiff also consulted counsel in Louisiana, obtained a title certificate on the property, and obtained an affidavit by an agent of the grantor, United States Gypsum Company, concerning the claims against the subject property. Prior to or contemporaneously with his purchase, the plaintiff obtained a policy of title insurance on the property.

The special warranty deed that the plaintiff obtained on the land contained the following sentence:

This conveyance is made subject to the right of the Board of Mississippi Levee Commissioners, as reflected in the deed to Grantor at Book 454, Page 59 and as set out in the further Perpetual Easement Deed dated August 4, 1978, recorded at Book 1396, Page 309, of said Chancery Court Clerk's Office.

The deed at Book 454, Page 59 referred to in McDonald's special warranty deed was a deed from Anna W. Collins to United States Gypsum Company dated February 8, 1951. The rights of the Mississippi Levee Commissioners that the McDonald deed is made subject to are set forth in the Anna W. Collins' deed. The deed provides that the conveyance is made "subject to any and all easements owned by the Board of Mississippi Levee Commissioners". No specific rights of the Mississippi Levee Commissioners are specified in the conveyance. A map of the land that was the subject of the deed is attached to the Anna Collins' deed. An outline of a fence along the levee is indicated on that map. The plaintiff testified, however, that when he made a visual inspection of the property prior to purchase, the riverside fence was not in place. Also, grass growing on the subject land was tall, in some places waist-high.

When the plaintiff first became interested in purchasing the Palmetto property, he received a letter from United States Gypsum in which a brief description of the property and a location map were enclosed. The letter also provided: "The small portion of this property east of the main-line Mississippi River levee is within the Levee Board right of way and under their control." A subsequent letter from United States Gypsum also provided:

A portion of this property is subject to an Easement controlled by the Board of Mississippi Levee Commissioners for Mississippi River Levee right-of-way and maintenance purposes. We have discussed this and I understand you have observed recent work done by the Corps of Engineers on these areas.

The plaintiff testified that he did not understand the word "controlled" to mean that the Levee Commissioners had obtained the grazing rights to his property. The plaintiff further testified that he did not inquire as to whether the term "control" meant that the Levee Board had extensive rights on the land because he relied on the title search to determine what the encroachments on the land were.

Another source that could have given McDonald notice of the Levee Board claim to the grazing rights on his land were the land records. As stated above, a title search was made on the property and no mention of grazing rights was found in any of the records. Also, no maintenance contracts were recorded as may be done pursuant to Mississippi law. Each easement award provides that the award is made for the purpose of building, building and repairing, or just for repairing the levee. The awards do not provide that there is an easement to maintain the levee and do not provide that grazing rights are included in the easement.

The word grazing was never mentioned in any of the title records or in plaintiff's

negotiations and inquiries concerning the subject land. Neither were the maintenance contracts mentioned. McDonald testified that although he inquired as to the interest of the Levee Board in the Palmetto property, he did not contact the Levee Board directly prior to purchasing the land concerning the nature or extent of the Board's rights on the land. McDonald stated that he assumed the Levee Board had authority to maintain the levee similar to the authority that the Levee Board in Louisiana has. The plaintiff also personally inspected the property prior to closing and found the levee land on his property unencumbered by fences or cattle.

The plaintiff testified that, at the time of purchase, he was aware that easements existed on his land for levee purposes. He did not know that the Levee Board interprets its power to maintain the levee as including the right to appropriate the grazing rights on the levee.[2]

The plaintiff was familiar with the policy of the Atchafalya Basin Levee District in Louisiana that permits property owners of land over which the Levee Board has an easement to lease the land for pasturage to third parties subject to the control of the Levee Board. Since 244 acres of the plaintiff's newly acquired land was subject to the same sort of levee easement, the plaintiff endeavored to lease that portion of his land for pasturage to third parties owning cattle.

The plaintiff contacted Mr. F. Aubrey Harris and offered to lease to Harris the exclusive grazing rights on the plaintiff's property. On June 1, 1982, Harris informed the plaintiff that the Levee Board controlled the lands lying within the boundaries of the main-line Mississippi River levee right-of-way and easement and that the Levee Board had granted maintenance contracts on two sections of the levee lying on the plaintiff's property to Cooper

**2.** Edwin W. Tindall, Esquire, testified that his law firm conducted a title search on the subject property for the plaintiff. He testified that, except for a 1978 perpetual easement deed and a 1951 deed vaguely referring to Levee Board

rights, nothing concerning grazing rights on the plaintiff's land was found. Tindall stated that he did not discuss the extent of the Levee Board's easement with the plaintiff prior to the plaintiff's purchase of the property.

Farms, Inc. These maintenance contracts included grazing rights.

Upon inquiry the plaintiff learned that maintenance contracts on the land that he owns are granted by the Levee Board for a duration of five years to cattle owners located in close proximity to the levee. Defendant Newman Bolls, Chief Engineer of the Levee Board, selects the persons to whom the maintenance contracts are awarded. In making this selection, Bolls is guided by the Levee Board's "Policy for Entering Into Levee Maintenance Contracts", a policy that was adopted by the Levee Board on February 14, 1952. This policy reads as follows:

1. Board shall select as contractor only persons who are able to satisfy the Board that they are capable of maintaining levee and right of way in accordance with contractual requirements attached.

2. Contractor selected must have equipment and plant and be prepared to carry out terms of contract.

3. Board must be satisfied that application is not submitted for purpose of transfer to some unknown person and Board will not necessarily recognize such transfer.

4. Require bond—$3.00 per station.

5. No contracts for less than 3,000 feet, unless necessity demands it.

6. It is to be understood, that contracts are to be entered into on a five year basis only, with no obligation on the Board to renew any contract, with any individual, firm or corporation after such time.

Bolls testified that in deciding who should receive maintenance contract awards he reviews questions on the applications of interested persons with the factors listed in the Levee Board policy as guidelines.[3] Bolls testified, however, that these factors are not applied with consistent importance and that he considers a variety of factors and circumstances in evaluating each candidate.

Bolls testified that the Levee Board adopted the levee maintenance contract policy on February 14, 1952, and that the board is presently operating under that same policy. Prior to 1952 there were different types of maintenance contracts. Bolls testified that although there are six factors listed in determining who will receive maintenance contracts, these factors are not absolute requirements. For instance, Bolls testified that although Item 3 requires that the board be satisfied that the application for the maintenance contract is not submitted for purposes of transfer to an unknown person, such a transfer could be possible in some instances within Bolls' personal discretion. Bolls also testified that he looks at other factors besides those listed in the board's policy. For example, Bolls stated that he looks to see whether the applicant is in the cattle business and whether he has a place where cattle may be moved at times of flooding. Consideration is also given to whether the applicant lives in close proximity to the levee or has a local agent that is responsible and has authority to make decisions concerning maintenance of the levee.

Bolls admitted that it would be possible for a property owner such as the plaintiff to maintain the land under the Levee Board's supervision just as maintenance contractors have been allowed to do. He also admitted that it is possible for someone like the plaintiff to select a resident agent to maintain the land. Bolls stated, however, that the reason the plaintiff could not be awarded a maintenance contract is because he wants to transfer the mainte-

---

3. Questions submitted to applicants include:

Are you the reversionary owner of the Levee Board right-of-way covered by this contract?

Are you the owner or lessee of the adjacent landside property?

Are you presently in the cattle business?

What type of equipment do you own to maintain this levee contract?

Who will supervise the program?

Do you have any additional pastures available?

Do you understand that this contract cannot be transferred or assigned without written permission from the Levee Board?

Do you understand that any attempted rental or sale of this contract will subject this contract to cancellation?

nance contract to someone else.[4] Upon further questioning Bolls regressed from this position by stating that if the maintenance contract were transferred to a third person who was recognized by the Levee Board as being competent then such a transfer by way of lease or sublease possibly would be permitted. Bolls reiterated that it is ultimately his personal decision on who will receive the maintenance contract awards.

In deciding which applicant will receive the maintenance contract award, Bolls stated that the fact that an applicant owns the property upon which the maintenance contract exists is not significant in determining whether he will receive the award.

Bolls testified that if a maintenance contractor does not properly maintain the levee as required by the board, the board can take away his contract. Criminal statutes are also available for prosecuting a contractor for defacing the levee. Bolls did not state why these same procedures could not be applied to a landowner who has sublet the levee for grazing purposes.

A copy of the maintenance contract that the Levee Board enters with a maintenance contractor was offered into evidence. Bolls did not state why a similar contract could not be entered with a person who desired to lease the grazing rights from the property owner. Bolls admitted that even under the present maintenance contract system there have been problems with maintenance contractors not properly maintaining the levee. Bolls states, however, that he has been able to deal with those problems pursuant to his authority and pursuant to state statute. He did not state why he could not use this same authority and these same statutes in dealing with a lessee of the landowner.

Bolls testified that the present maintenance contract system saves the Levee Board much money because the Levee Board does not have to pay to maintain the levee by mowing or trimming vegetation.

At the same time the maintenance contractor is saving money because he does not have to pay any rent for using those pasturage lands. Bolls admitted that while the system is very beneficial to the Levee Board and to the maintenance contractor, the system deprives the landowner of rent he could receive from leasing the grazing rights on the land out to third persons or from profits he might derive from cattle operations. Bolls further testified that if the landowner could rent out the subject land and if the land were maintained pursuant to the requirements of the Levee Board, then both the landowner's purposes in making a profit from his land and the Levee Board's need to maintain the levee could both be met.

Based on the factors listed in the Levee Board's policy, namely that the applicant must own cattle and that he cannot sublet the contract, the plaintiff determined that it would be impossible for him to obtain a maintenance contract on his own land. The plaintiff asserts that since he owns fee simple title to the surface of the land, his title includes all uses except those that have been excepted specifically in the easement or deed. Thus, the plaintiff asserts that his fee simple title includes the right to graze his lands and make profits from his lands since these uses are not excepted from his title. The plaintiff asserts that because he has not been allowed to lease his property out for grazing, or for any other purpose, the property within the easement has no value to him.[5] The plaintiff further asserts that the only thing that he is allowed to do with this property is to pay the ad valorem taxes on it.

McDonald admitted that maintenance is an important part of preserving the levee and that grazing is a preferred way of maintaining the levee. If allowed to sublease the property out to cattle grazers, the plaintiff asserts that he could make a profit from his land and still meet the require-

---

**4.** The plaintiff McDonald testified that he is not in the cattle business and has no desire to commence cattle operations.

**5.** It is noted that the mineral estates had been reserved by a previous owner of the property.

ments of the Levee Board in maintaining the levee. He asserted that his use of the levee land in leasing grazing rights would not be inconsistent with the purpose of the Levee Board's easement.

Mike Nelson, a Louisiana attorney retained by the plaintiff, testified that after the plaintiff learned that the Levee Board claimed that it had the right to determine who would be allowed to graze cattle on the plaintiff's property, he contacted defendant Bolls to investigate the situation. Mr. Bolls stated that it would be impossible for the plaintiff to get a maintenance contract for the purpose of grazing cattle on his own land during the five year period of the then-existing maintenance contract. As to future contracts, Bolls stated that, although the plaintiff held title to the land and was the reversionary owner of the land, he had no rights on the property subject to the levee easement. Bolls also stated that in order for the plaintiff to be considered for a maintenance contract award, he would have to live in the locality and be in the cattle business. Bolls stated that, although he occasionally gave maintenance contracts to non-resident corporations with agents located in the area, he would not give such a contract to a non-resident individual without an agent in the area.[6]

Mr. Nelson further testified that in reviewing and plotting the easements that the Levee Board has on the plaintiff's land, there appears to be a number of acres of land upon which he was unable to find recorded awards or easements by the Levee Board. Plaintiff's exhibit 8C is a plat that depicts the Levee Board easement award. Defendant's exhibit 3 is a compilation of the easement awards that the Levee Board has obtained on the land now owned by the plaintiff. When the awards are plotted according to their terms, a substantial portion of land that the Levee Board claims is subject to Levee Board easements

is not included in these awards. However, each award provides: "See map on file in office of the Engineer Department, Greenville, Miss." The Levee Board asserts that the map on file in the engineer's office accurately depicts the Levee Board's easements and that the descriptions in the Levee Board easement awards are incorrect. The map on file in the engineer's office indicates that the 70 acres in question are subject to the Levee Board's easement.

As evidence of the extent of the Levee Board's easements on the plaintiff's property, Bolls testified that fences on the subject area have been in existence since 1954. The landside fence that is currently in place is the same fence that was constructed in 1954. The riverside fence that was originally constructed in 1954 was maintained until 1979. The evidence shows that the fence was then taken down for several years while parts of the levee were being reconstructed or repaired. The fence was rebuilt in 1982 and cattle were put back on the levee. That fence has now been moved out about 75 feet. The evidence shows, however, that when the plaintiff visited the property prior to purchasing it, the fence was down. A map of the plaintiff's property that was made in 1950 prior to the conveyance of that property from Anna Collins to the United States Gypsum Company indicates fence lines on the subject property at that time.

The easement awards do not indicate that an easement for grazing purposes was intended to be included in the easement. The awards do not even include the term "maintenance." Rather, the awards provide that the easements are for the purpose of "enlarge[ing] and repair[ing] the levee." Bolls testified that he does not know exactly what the landowners were being compensated for in the awards made and damages paid by the commissioners for the

---

**6.** Bolls did, however, forward a maintenance contract application form to the plaintiff. The plaintiff stated that he never submitted an application form because he did not meet the requirements listed in the board policy. The plaintiff reasoned that submitting an application would be futile because of the non-assignability restriction and because of the requirement that the contractor be in the cattle business.

property that is now the plaintiff's property. These awards took place between 1906 and 1948.

Samuel Lowell Hernandez, a retired division engineer for the Corps of Engineers in Greenville, testified that his duties as a division engineer required him to make informal inspections of the levee frequently. Hernandez testified that the Greenville Levee Board received superior ratings from these inspections. Hernandez testified that, if landowners were allowed to fence off the portion of their land subject to levee easements, the proper maintenance of the levee would be impeded because the number of cross fences would be increased. In Hernandez's opinion the present policy used by the Levee Board results in superior maintenance of the levee. Hernandez testified that in his opinion the Levee Board could not properly maintain a levee if it did not have control over the levee and control over the person who has the contract for maintaining the levee. He did not state upon what facts he based his opinion.

The president of the Mississippi Levee Board, Drew Lundy, testified that only one other complaint on the levee maintenance policy of the Levee Board has occurred. The Levee Board has maintained the levee under claim of right since at least 1952.

On cross-examination, Lundy testified that the Mississippi Levee Board has not adopted any rules that establish policy in compliance with the Administrative Procedures Act in Mississippi nor has it publicly advertised for bids on maintenance contracts.

As owner of the property, the plaintiff estimates that the value of the property that the Levee Board claims for grazing purposes is between $10 and $32 per acre per year, or an average of $20 per acre per year. Plaintiff states that if he were permanently deprived of the use of this property the value would be $91,744 plus $322 per year property tax. The plaintiff states that he arrived at these amounts by calculating the number of acres divided by the purchase price of his property. The property tax was arrived at by multiplying the

number of acres (244) by $1.32. In determining the value of the property the plaintiff states that he assumed the land was without timber and then added the value of timber to the acreage on which timber was growing.

The parties have stipulated that the Board of Levee Commissioners for the Yazoo District, which is north of the Greenville District, owns the levee in fee simple. That district charged the following rentals on the levee land for grazing purposes:

| 1982 | $5 per acre |
| 1983–85 | $6.50 per acre |
| 1986 | $4 per acre |

Mr. Lundy, who is a realtor and has occasion to appraise land, testified that in his opinion the value of pasturing on the levee would be considerably less than in other unrestricted areas. He testified that the value of the land burdened by the levee easement is between $75 and $100 per acre. The rental value of this land is $5 to $10 per acre per year in Lundy's opinion.

### CONCLUSIONS OF LAW

The plaintiff asserts several different grounds for relief in this cause. He asserts that: (1) He has been denied the privileges and immunities guaranteed by the United States Constitution because he is a non-resident; (2) His Fifth and Fourteenth Amendment rights have been violated; (3) The defendants have deprived him of his constitutional rights under color of state law in violation of 42 U.S.C. § 1983; and (4) The Levee Board has violated Mississippi administrative law in issuing the maintenance contracts.

### 42 U.S.C. § 1983 CLAIM

Section 1983 of Title 42 provides:

Every person, who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or im-

munities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The plaintiff asserts that he is entitled to redress pursuant to this statute because the defendants have deprived him of his property rights pursuant to the Levee Board maintenance policy.

As a prerequisite to maintaining a § 1983 claim, the plaintiff must establish: 1) that the defendants were acting under color of state law, and 2) that while acting under color of state law the defendants violated rights of the plaintiff that are protected by the United States Constitution or laws of the United States. *Parrott v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); *Augustine v. Doe,* 740 F.2d 322, 324 (5th Cir.1984). The court is of the opinion that both of these requirements have been met, and indeed the defendants do not raise any arguments concerning these prerequisites. The maintenance policy was officially adopted and promulgated by the Levee Board commissioners on February 14, 1952. The Levee Board commissioners are officials to whom the state legislature has delegated policy-making authority. Further, the practice of awarding maintenance contracts without considering the servient fee owner's property interests has been such a common and well-settled procedure in Washington County that it can be said to represent state policy. *See Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Shelton v. City of College Station,* 754 F.2d 1251, 1257 (5th Cir.1985). It is further clear that the right of the plaintiff as a landowner to use and enjoy his property in a lawful manner is a right that is protected by the United States Constitution as is the right not to have one's property taken without just compensation. Thus, both prerequisites to maintaining a § 1983 action have been met.

The court also finds that because the plaintiff's claim is based upon the intentional deprivation of his property interests pursuant to established state procedure, the plaintiff does not have to pursue state remedies before maintaining his § 1983 action. *Shelton,* 754 F.2d at 1257; *see also Williams v. City of St. Louis,* 783 F.2d 114, 118 (8th Cir.1986).

## I.

## PRIVILEGES AND IMMUNITIES CLAIM

[4] The plaintiff asserts that the Levee Board discriminates against non-residents in awarding maintenance contracts. The evidence demonstrates, however, that non-residents have in fact received maintenance contract awards in the past. Furthermore, testimony at trial demonstrated that the Levee Board deems it essential that the maintenance contractor or his agent live in close proximity to the land upon which he holds a contract. It is necessary that the maintenance contractor or his agent live in close proximity to the land upon which the contract is given so that there will be someone available to supervise and insure that the levee under contract is properly maintained and to promptly remove cattle from the levee in the event of flooding. There is no evidence that the Levee Board's policy in awarding maintenance contracts is intended to or in fact has the effect of discriminating against citizens of other states based on the mere fact that they are not citizens of Mississippi. Accordingly, the court is of the opinion that the plaintiff cannot recover on this cause of action.

## II.

## FIFTH AMENDMENT CLAIM

The plaintiff claims that the defendants have taken his interest in grazing cattle on the levee land owned by the plaintiff without compensating him or prior owners for this taking. McDonald asserts that the easements that exist on the subject land do not encompass the right to appropriate the landowner's grazing rights on that land and that the Levee Board's appropriation of those rights amounts to a taking of the

plaintiff's property without due process and just compensation.

The Board asserts that when the easement awards were first made the awards included compensation for the taking of all uses of the levee land, including the taking of grazing rights. This assertion is weakened, however, by Boll's testimony that he does not know whether the landowners were compensated for the taking of grazing rights.

Initially, the court recognizes that the fifth amendment to the United States Constitution provides that "no persons shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation." Article 3 of Section 17 of the Mississippi Constitution of 1890 has a similar provision that declares that "private property shall not be taken for public use, except on due compensation being first made to the owner or owners thereof...."

In determining whether the easements that exist include the right to take and use the grass growing on the levee for grazing purposes, the court must first decide what portion of the plaintiff's land is covered by the easements. The plaintiffs assert that easements have not been obtained on the land covering the mainline of the levee. See exhibit P–8C. The defendants assert that easements do exist on this land either by grant or prescription.

The defendants assert that when the easements were first plotted by metes and bounds they were inaccurately recorded on the easement awards. However, most of the awards provide: "See map on file in the office of the chief engineer in Greenville, Mississippi." The defendants assert that the map on file in the chief engineer's office correctly shows the easements that were taken and that the acres in issue were in fact subject to easement awards. While this map does indicate that all of the plaintiff's land on the levee is subject to the Levee Board easements, it does not indicate which awards established the easements. For example, there is no easement award covering the strip of land on the main line of the levee.

The defendants assert that the notice in the easement awards to see the Chief Engineer's map was adequate to put the plaintiff on notice that the acres in issue were in fact subject to the Levee Board easements and that prior land owners had been compensated for the Levee Board's use of this land. Alternatively, the defendants assert that since the Board has exercised control over this land for many years, they have obtained an easement by prescription on the land that was not the subject of an easement award.

### A. Creation of Easements

■ Generally, an easement is a right that one has to use another's land for a specific purpose that is not inconsistent with the other's ownership interest. 25 Am.Jur.2d *Easements* § 1 at 416–17. An easement may be acquired by express grant, implied grant, or prescription. *Gulf, Mobile & Ohio R. Co. v. Tallahatchie Drain Dist.*, 218 Miss. 583, 67 So.2d 528, 533 (1953).

■ In the instant case the easements that were acquired by express grant were acquired pursuant to statute giving the Levee Board the right to appropriate property for the purpose of maintaining the Levee. This statute granting the Levee Board the power of eminent domain, "is in derogation of the common law and should be construed favorably to the owner and against the condemnor." *Nicholson v. Board of Mississippi Levee Commissioners*, 203 Miss. 71, 33 So.2d 604, 608 (1948) (citation omitted). This rule of construction applies in determining the quantum of interest and extent of the interest that has been taken pursuant to eminent domain powers. *Id.*

■ If the statute granting the power of eminent domain does not specify the quantum of the estate to be taken, the condemnor may take only the estate that the particular public use demands. *Id.* As provided in 18 Am.Jur. Easements, § 115, at 741:

In the absence of any definition of the estate which the grantee of the power is authorized to acquire or any limitations in the granting statute, no more property can be taken than the public use requires; this rule applies both to the amount of property and the estate or interest in such property to be acquired by the public. Furthermore, it is universally recognized that a grant of the power of eminent domain will not be extended by implication, and that when an easement will satisfy the purpose of the grant, the power to condemn the fee will not be included in the grant unless it is expressly provided. Accordingly it is well settled that when land is taken for the public use, unless the fee is necessary for the purposes for which the land is taken * * * the public acquires only an easement. The public easement, or servitude as it is sometimes called, in such a case extends to all uses directly or incidentally conducive to the advancement of the purpose for which the land was acquired, and to no others; and the owner retains the title to the land in fee and the right to make any use of it that does not interfere with the full and free exercise of the public easement.

 Generally, an instrument creating an easement must contain all of the formalities of an instrument granting land and should be definite and certain in its terms. *See Gulf,* 67 So.2d at 533. If the easement is definite and certain, it must be taken at face-value. If, however, the easement instrument is ambiguous, the court must endeavor to ascertain what the parties' intentions were at the time the easements were obtained. *See Boggs v. Eaton,* 379 So.2d 520, 522 (Miss.1980).

 In determining what land was included in the easement awards in the instant case, the court must analyze all provisions concerning the dimension of the awards and attempt to give effect to each provision. *Id.* at 522. Although the awards indicate the length and width of each parcel of land to be covered by the easement, the location of the land, and the number of acres subject to each award, the instruments also provide: "See map on file in the office of the Chief Engineer in Greenville, Miss." The court is of the opinion that this reference to an extrinsic map renders the awards incomplete and necessarily ambiguous. The map on file in the Chief Engineer's office indicates that all the land that the plaintiff owns on the levee is subject to the levee easement. Testimony at trial, however, indicates that when the measurements shown in the easement awards are plotted, a significant portion of the plaintiff's land on the levee is not covered by any easement award.

 Since the easement awards are ambiguous, the court must look to the circumstances of the parties to determine their intent when the easement awards were drafted. In trying to ascertain the intention of the parties involved in the easement awards, the court is mindful of the general rule that an instrument granting an interest in land ordinarily will be construed against the grantor. *Id.* at 522. When, however, the grantee is the one that drafted the instrument, the document will be construed against the grantee. *Baker v. Columbia Gulf Transmission Co.,* 218 So.2d 39, 41 (Miss.1969); *Hamilton v. TransContinental Gas Pipe Line,* 236 Miss. 429, 110 So.2d 612, 613 (1959); *Capital Electric Power Assoc. v. Hinson,* 226 Miss. 450, 84 So.2d 409, 413 (1956).

In the absence of other circumstances indicating the intentions of the parties to the easement awards, the court would be inclined to endorse the plaintiff's position that the land not included in the awards is not subject to the Levee Board easement. In making the easement award, the Levee Board used a pre-printed form that referred to a map that was not attached to the awards. There is no indication that the landowners knew what the map indicated or that they even saw the map before signing the easement awards. There is also no indication as to how some of the easements indicated on the Chief Engineer's map were obtained—no documents exist that record some of these awards. Other circumstanc-

es exist, however, that indicate that the parties to the original easement awards intended that the Levee Board acquire easements over the entire land at issue.

Evidence that an easement was granted may be derived from the fact that the easement has been enjoyed for so long as to be regarded as proof that a grant of the easement was originally made though no deed exists which creates the easement. *Gulf*, 67 So.2d at 533. The Levee Board has enjoyed the use of the land at issue for more than 30 years, and no one has previously challenged the existence of the Levee Board's easement on this land. Additionally, the map in the Chief Engineer's office indicates that at least the Levee Board intended that its easement cover all the land at issue. Further, the plaintiff testified that he knew that the levee land on his property was subject to Levee Board easements. He did not indicate that he was misled by the gaps in the easement awards when he purchased the property.[7] From this evidence, the court is of the opinion that the original parties to the easement awards intended that all of the land on the levee be subject to the Levee Board's easement and that the plaintiff was aware of this intent at the time of purchase. Thus, all of the 244 acres are subject to the Levee Board easements.

### B. *Extent of Easement*

The defendants contend that the Levee Board's easements give the Levee Board exclusive control of all the land subject to the easements. Testimony at trial by defendant Bolls establishes that in the Levee Board's opinion the plaintiff only has the right to pay the taxes on the land and the highly unlikely right to a possibility of reverter of the surface of the land. The plaintiff contends that if the defendants' position were adopted, the Levee Board would in fact be obtaining a fee simple estate and not merely an easement. The court must first analyze the extent of the easement that was acquired by the Levee Board by grant, and then what, if anything, was acquired by prescription or by implication.

### 1. *By Grant*

In determining what was acquired by grant, the court is of the opinion that, at most, the easement awards gave the Levee Board the right to use the plaintiff's land for the purposes of building and repairing the levee. It is settled law that a clause in an easement that gives an easement holder certain rights will not be broadly construed so as to grant additional rights to the easement holder. *See Turner v. Morris*, 196 Miss. 297, 17 So.2d 205, 206 (1944). As stated earlier, the easement awards provide that the purpose of the easement was limited. Some awards provide that the purpose is to build the levee, others provide that the purpose is to build and repair, and at least one award provides that the purpose is only to repair the levee. None of the awards provide that the easement over the land is taken to maintain the levee or to take the profits from the land subject to the levee easements. The extent of the interest that was taken is set out with particularity in many of the awards. For example, some awards provide that timber land is taken and that so much per acre was paid, crop land was taken for so much per acre. Other awards provide that cleared land was taken for so much per acre. The court is of the opinion that "cleared land" was not intended to mean that the grazing rights were taken nor that the landowner was compensated for the value of the grazing rights on the land subject to the easements.

These awards did not expressly or by implication give the Board the right to exclude the plaintiff from his own property under the guise of maintaining the levee. Just as an award to build and repair a road does not give the easement holder the right to exclude the landowner from

---

7. The court notes that prior to construction of the levee on the Mississippi River that much of the Mississippi Delta was practically worthless swamp land, and that subsequent to the construction of the levee that the lands east of the levee in the delta region constitute some of the most productive farm land in the world.

using that road, neither do the awards in the instant case give the Levee Board the right to exclude the plaintiff from using his land in a manner that is consistent with the easement that was granted. The court is of the opinion that the easement awards neither gave the Levee Board the right to appropriate the landowners' grazing rights on the levee for the purpose of maintaining the levee nor did the awards compensate the landowners for the taking of these grazing rights. Grazing cows on the levee is a use that is consistent with the easements that were granted to the Levee Board, and the Levee Board cannot rely on the terms of the easement awards to exclude the plaintiff from using his land in a manner that does not interfere with the easements to build and repair that were granted.

### 2. *By Prescription*

The Levee Board asserts that if it did not obtain the right to exercise full control over the plaintiff's land on the levee expressly through the easement awards, it did obtain an easement to exercise full control over the plaintiff's land on the levee, including an easement to appropriate the grazing rights, by prescription. The gist of the Levee Board's argument is that by exercising control over the plaintiff's land for over 10 years, it has enlarged the extent of the easements it originally acquired in the easement awards. The court is of the opinion that even if what the defendants call an easement were obtained by prescription, the easement could not give the easement holder the right to exercise full control over the landowner's realty. Rather, even if the easements were broadened by prescription to include additional uses of the plaintiff's land, the easements, by definition, must be confined to use of another's land for a particular purpose, not for any and all purposes. In such a situation the landowner retains full dominion over his realty subject only to the easement, and the landowner may make any use of his realty that does not interfere with the easement holder's reasonable use of the easement. *Feld v. Young Men He-*

*brew Ass'n of Vicksburg,* 208 Miss. 451, 44 So.2d 538, 540 (1950).

While it is true that the owner of an easement obtained by grant or prescription has the implied right to work the land to keep it in a reasonably useable condition for its intended purpose, the easement owner "cannot lawfully take dominant possession and deal with [the land upon which the easement exists] as if he were the owner of the land." *Quin v. Sabine,* 183 Miss. 375, 183 So. 701, 702 (1938). An easement, whether obtained by grant or prescription, is a limited interest in land; it does not include the right to occupy and enjoy the land itself. An easement gives no title to the land on which it is imposed and confers no right to participate in the profits that arise from the land. 25 Am.Jur.2d, *Easements,* § 2 at 417. It is not a possessory interest or an interest that can become possessory. 1 G. Thompson, *Commentaries on the Modern Law of Real Property,* §§ 321 and 335.

In order to have a right to participate in the profits that might arise from another's land, one must have an interest in the land known as a *profit a'prendre.* A *profit a'prendre* is "a right exercised by one person in the soil of another, accompanied with participation in the profits of the soil, or a right to take a part of the soil or produce of the land." 1 G. Thompson, *Commentaries on the Modern Law of Real Property* § 139 at 485 (1980 replacement). As stated in 25 Am.Jur.2d, *Easements,* § 4, a *profit a'prendre* is distinguishable from an easement since one of the characteristics of an easement is the absence of any right to participate in any of the profits derived from the land upon which the easement exists. *See also United States v. Gossler,* 60 F.Supp. 971, 974 (D.Ore.1945) (*profit a'prendre* is the power and privilege to acquire, through severance, ownership of some part of the physical substances included in the possession of land); *Burlingame v. Marjerrison,* 665 P.2d 1136 (Mont.1983) (*profit a'prendre* is a non-possessory interest in land that con-

sists of a right to take the soil or substance of the soil, such as the right to take wild game or fish, or the right to feed cattle on another's land); *accord,* 1 G. Thompson, *Commentaries on the Modern Law of Real Property,* § 139 at 486 (1980 replacement) (*profit a'prendre* does not fall within the usual definition of an easement because generally, an easement is a privilege without profit). A *profit a'prendre* is, however, similar to an easement in that it is more than a license, it is an interest in land.

 A right of *profit a'prendre* may be either in gross or appurtenant. A right of *profit a'prendre* that exists independently of ownership of land by the claimant is a profit a prendre in gross. *Oakley Valley Stone, Inc. v. Alastra,* 110 Idaho 265, 715 P.2d 935, 937 (1985). For example, where one possesses the exclusive right to remove timber or to hunt and fish on another's land, he possesses a *profit a'prendre* in gross. *Id.*

Courts that have discussed *profits a'prendre* and easements have been careful to make the distinction between easements and *profits a'prendre* on the one hand and the right to occupy and enjoy the land itself on the other. These courts have held that where the claimant actually had complete possession of the subject property, the claim amounted to a complete taking inconsistent with a claim of easements or of *profit a'prendre. Burlingame,* 665 P.2d at 1139; *Platt v. Pietras,* 382 So.2d 414, 416 (Fla.App.1980). In the case of *Burlingame v. Marjerrison,* 665 P.2d 1136 (Mont.1983), the defendants had used a portion of property that they thought belonged to them for cattle grazing, agriculture and timber harvesting for 48 years. A fence had been constructed around this parcel of property as early as 1916. In 1978, the plaintiffs bought the adjacent parcel of land and had a survey done on the land. This survey revealed that a fence

between the plaintiffs' property and the defendants' property enclosed approximately five acres of the plaintiffs' tract. The plaintiffs then brought suit to quiet title to the five acres. In defense of their claim of right to use the land at issue, the defendants asserted that they had either acquired title to the property through adverse possession or that they had acquired prescriptive easements on the parcel for grazing, agriculture and timber harvesting purposes.

In rejecting the defendants' position, the Montana Supreme Court reasoned that the prescriptive right that the defendants claimed that allowed them to take profits from the plaintiffs' property would have the effect of leaving the plaintiffs with an empty fee title. *Id.* at 1140. The court stated that where one acquires all the rights incidental to ownership, the situation is not one of a prescriptive right but is a claim for adverse possession. The court held that in such a situation the defendants cannot gain rights to the profits of the land through a claim of prescription but must meet all of the requirements of adverse possession. *Id.*

In the *Burlingame* case, the court found that the defendants' use and occupancy of the plaintiffs' land did not amount to an acquisition of an easement or a *profit a'prendre.* Rather, the court stated that such use and occupancy amounted to complete possession, dominion and use of a parcel of the plaintiffs' land to the exclusion of plaintiffs and their predecessors in interest. The court determined that such an exclusive possession, dominion and use of the property took on the aspect of a fee. *Id.* The Montana Supreme Court concluded that although the defendants' use of the land had been open, notorious, exclusive, adverse, continuous, and uninterrupted, a prescriptive right to the profits of the land could not be awarded.[8]

**8.** Additionally, in determining whether the defendants had obtained title by adverse possession, the court held that since the defendants had not paid the taxes on the land throughout the statutory period required for adverse possession, they did not obtain title to the land. The defendants had acquired no interest in the land or profits therefrom whatsoever.

In another case similar to the instant case, *Platt v. Pietras*, 382 So.2d 414 (Fla. App.1980), the appellant had fenced a subdivision and had used the fenced area for grazing of cattle for more than 20 years. Owners of the land brought a class action to enjoin the continuing trespass by Platt over land that they owned. The appellant did not claim title by adverse possession to this land but claimed a prescriptive right to the continued use of the plaintiff's property for grazing purposes. In analyzing the facts and claims in the case, the *Platt* court stated "the grazing of cattle is more than an easement—it is a privilege plus a profit, the taking of forage—and generally characterized by the authorities as a *profit a'prendre.*" 382 So.2d at 417. The *Platt* court further made the distinction between a *profit a'prendre* in gross and a *profit a'prendre* that is appurtenant to other land. As stated by the *Platt* court, if a *profit a'prendre* is enjoyed by reason of the fact that the holder thereof also holds a certain other estate, then the *profit a'prendre* is regarded as appurtenant to the other estate and may not be severed from it. Conversely, if one owns a *profit a'prendre* distinct from any ownership of other lands, it takes the character of an estate in the land itself. *Id.* at 417 n. 1 (quoting 25 Am.Jur.2d *Easements*, § 4 at 417). Based on this distinction the Florida court found that the grazing of cattle on another's land was not appurtenant to any other land owned by the appellant. Thus, the court held that the *profit a'prendre* that the appellant was seeking to establish was a *profit a'prendre* in gross. The *Platt* court concluded that under the facts presented "a *profit a'prendre* in gross could not be acquired by prescription because the appellant's claim, while characterized as an easement, [was] really complete possession, dominion and use of the appellee's property to the exclusion of the appellee and [took] on the aspect of a fee." *Id.* at 414.

The court stated that such a complete dominion is inconsistent with a claim of easement or *profit a'prendre*. *Id.* at 416. The court quoted the Arizona Supreme Court's reasoning in *ETZ v. Mamerow*, 72 Ariz. 228, 233 P.2d 442 (1951) as follows:

An allegation of exclusive possession is wholly inconsistent with the theory of establishing an easement. The right to possess, to use and enjoy land upon which an easement is claimed, remains in the owner of the fee except insofar as the exercise of such right is inconsistent with the purpose and character of the easement ... Thus it will be seen that an action to establish an easement does not involve possession or occupation of the land. It does not involve the enjoyment of the premises except to the extent of the use claimed under the easement. It does not disturb the legal title of the premises except as it is limited by the character of the easement. It does not involve dominion over the premises except that which is necessary for the enjoyment of the use.

In holding that the appellant had not acquired grazing rights by prescription, the Florida court concurred with a holding by the Utah Supreme Court. In *Deseret Livestock Co. v. Sharp*, 123 Utah 353, 259 P.2d 607 (1953), the court stated:

The fundamental issue in this case is: In the absence of statute, may a person through prescription acquire a *profit a'prendre* in gross? While we reserve a general answer to the foregoing question, we think that under the facts of this case, the authorities are correct in stating that prescription will not establish such a right. In *Gateward's* Case, 6 Co.Rep. 59b, 77 Eng.Rep. 344, we find the initial announcement of the concept, the court reasoning that a profit allegedly acquired by custom without a dominant estate would create an interest in the land approximating a fee, the interest being transitory, altogether uncertain, in no way controlled by the needs of a dominant estate, and hence, a right so unqualified cannot exist in the soil of a private landowner.

*Id.* 259 P.2d at 610.

This court is of the opinion that under the facts of the instant case the

interest that the Levee Board claims is in actuality a *profit a'prendre* in gross. This is so because the *profit a'prendre* is not appurtenant to other land but is a personal right that the Levee Board claims to hold.[9]

The *profit a'prendre* that the Levee Board wishes to impose upon the defendant's property by prescription amounts to a right of complete control of the defendant's property. As such, it is such an unqualified right that this court holds that it cannot exist in the soil of the plaintiff. What the Levee Board is actually claiming is title in the plaintiff's land amounting to a fee. Thus, in order to have acquired such title, the Levee Board must have complied with the requirements of adverse possession. In order to gain title to land in Mississippi by adverse possession, a person must claim to be the owner of land and be in possession of that land for at least 10 years. Miss.Code § 15–1–13 (1972). In order for the adverse claimant to meet the possession requirement, he must meet six requirements. The possession must be (1) hostile and under claim of right; (2) actual; (3) open, notorious and visible; (4) exclusive; (5) continuous and uninterrupted; and (6) peaceful for more than 10 years. *Johnson v. Black*, 469 So.2d 88, 90 (Miss.1985).

In the case *sub judice*, the court need not analyze the requirements to meet the possession requirement because the court finds that the initial requirement, that the party claim ownership of the land, has not been met. The Levee Board introduced no evidence that it has claimed ownership to the subject property for the requisite period. On the contrary, the Board recognizes that the plaintiff holds the title to the land and that the plaintiff is the one who must pay the taxes on the land. Additionally, the Levee Board has recognized that if the Levee Board's easement ever

ceases to exist, the Levee Board's interest in the plaintiff's land will revert to the plaintiff. These facts are inconsistent with a claim of adverse possession in the plaintiff's land. *See Coleman v. French*, 233 So.2d 796, 796–97 (Miss.1970). Moreover, the Levee Board in Washington County has not been given the statutory power to acquire title to land and therefore could not acquire the fee title by adverse possession. *See Hattiesburg Realty Co. v. Mississippi State Highway Commission*, 406 So.2d 329, 332 (Miss.1981). The court is accordingly of the opinion that the defendant has not acquired any rights in the plaintiff's land by prescription.

### C. *By Implication*

It is generally recognized that when a public easement is acquired, the easement by implication "extends to all uses directly or incidentally conducive to the advancement of the purpose for which the land was acquired, and to no others, and the owner retains the title to the land in fee and the right to make any use of it that does not interfere with the full and free exercise of the public easement." *Nicholson v. Board of Mississippi Levee Commissioners*, 203 Miss. 71, 33 So.2d 604, 609 (1948).

Some of the easement awards in the case *sub judice* provide that the easements were acquired for the purpose of "building" the levee; others provide that the purpose was to "build and repair"; at least one provides that the purpose was merely to "repair" the levee. None provide that the purpose was to acquire total control over the land subject to the levee easement. Also, although the Levee Board has the power to acquire an easement for the purpose of maintaining the levee, it cannot be implied that the Board was exercising this power when it acquired easements for

---

9. The right that the Levee Board claims is not a *profit a'prendre* appurtenant because in order to have an appurtenant right it must attach to and belong to some greater or superior right, it must be annexed to another thing more worthy, and pass as an incident thereto. 28 C.J.S. *Easements* § 4 at 634. The easements to build and repair

that the Levee Board owns are not superior rights to a right of *profit a'prendre*, but on the contrary are lesser rights. Therefore, the *profit a'prendre* that the Levee Board claims cannot attach to the easement as an appurtenance thereto.

the express purposes of building and repairing the levee. Furthermore, even if it could be implied that the purpose for which the easements in this case were acquired was to maintain the levee, it cannot be further implied that taking away the landowner's ability to make a profit from leasing the grazing rights on the land is a use that is directly or incidentally conducive to the hypothetical implied purpose of maintenance for which the easement was acquired. If such were the case, the Levee Board could obtain all the rights of the fee owner of any land upon which it has an easement by implication and leave the owner with an empty title.

In *Campbell v. Covington County*, 161 Miss. 374, 378, 137 So. 111, 112 (1931), the Mississippi Supreme Court stated:

And, whether the right of way is acquired by condemnation or prescription, the title to the soil, and all the profits thereof consistent with the existence of the easement, remain in the original owner. The title of the owner, subject only to the easement, remains perfect, not only to the land covered by the highway, but to all the material within its boundaries, except such as may be needed to build or maintain the road. The owner has title to any superfluous earth, gravel, or rock, not necessary or useful to the construction or repair of the highway, and to all mines, quarries, trees, grass, springs of water, growing crops, pasturage, upon and above the surface of the soil covered by the highway. But all these rights are subordinate to the use for which the land has been acquired by the public.

In the instant case, the appropriation of the right to make a profit from the grazing of cattle on the levee is not necessary in building or in maintaining the levee. The grass that has been appropriated by the Levee Board has in actuality been sold to third parties as feed for their cattle. The grass is not "used" in maintaining the levee, but is removed so that the levee will retain the proper growth of sod.

In *Nicholson*, the Mississippi Supreme Court held that the taking of the landowner's right to remove trees from the levee was not necessary or useful in maintaining the levee. It stands to reason that if the taking of the landowner's right to remove trees in a manner consistent with the existence of the easement is not necessary and useful to maintain the levee, neither is the taking of the landowner's right to remove the grass by grazing cattle. This is especially true in the instant case where the landowner proposes to remove the grass in such a manner that is not only consistent with the existence of the easement but which in fact contributes to the strengthening of the levee.

The Levee Board argues that adequate maintenance of the levee requires the personal selection by it of the maintaining party, yet the Board tenders no valid argument as to why the same high standards of performance and control may not be maintained by supervision of plaintiff or his assigns.

In *Board of Mississippi Levee Commissioners v. Roberts*, 34 So.2d 679 (Miss. 1948), the court acknowledged the adequacy of control maintained by the Levee Board through its power to alleviate substandard efforts of property owners in keeping the levee free of timber. In regard to the argument that implied in the Levee Board's right to have timber removed from the right-of-way was also the right to remove the timber itself and keep the proceeds for its own benefit, the court held:

The ownership of timber is subject to the paramount right of the Levee Board to have the timber gotten out of the way of any levee work with which the timber could interfere, which means that if, after notice, the owner of timber had failed or refused to remove such timber, the Levee Board could do it.

Further:

The owner had the right to remove the timber at such time and in such manner as to completely clear it as an obstacle to the levee work, and the Board had no

authority to refuse the offer, and a priori no right by such refusal to work a change of ownership in the timber from the owner to the Levee Board.

 While it is true that the Levee Board does have the power and duty to insure that the levee is properly maintained, and even to select the method of maintaining the levee, *see Reynolds v. Refuge Planting Co.*, 97 So.2d 101, 104 (1957), it does not have the power to appropriate the rights of the owner of the land without just compensation under the pretext of maintaining the levee. The owner of the fee, in the court's opinion, should have a superior right to graze his lands and the opportunity to comply with the requirements of the defendant Levee Board prior to the Levee Board contracting with third persons to accomplish the desired removal of grass and vegetation from the levee.[10]

In the court's opinion the plaintiff owner of the fee, as in *Nicholson, supra*, should be afforded notice and the first opportunity to graze his lands and to comply with the requirements of the defendant Levee Board prior to the Board entering into contracts with non-owner third parties to accomplish the desired removal of grass and vegetation from its levee. The conduct of the Levee Board in the case *sub judice* is tantamount to treating the fee simple owner of the easement property as a trespasser or interloper on his own property.

### III.

### SUBSTANTIVE DUE PROCESS CLAIM

 In considering the merits of the plaintiff's claim that he has been denied his substantive due process rights, the court first notes that analyzing the scope of a substantive due process claim "is by its nature an imprecise task." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1440 (11th Cir.1985). This court also recognizes that it cannot use the Fourteenth Amendment Due Process Clause to strike down the Levee Board's policy because the court may deem the policy to be unwise, but must look only to see whether the policy has a rational basis. *Corr-Williams Wholesale Co. v. Stacy Williams Co.*, 622 F.Supp. 156, 159 (S.D.Miss.1985). Basically, to state a cause of action for violation of substantive due process rights in the instant case, the plaintiff must show that the defendants' use of the maintenance policy to deprive him of the enjoyment of his property without just compensation was arbitrary and capricious in that the policy had no meaningful relationship to achieving or furthering a legitimate governmental goal. *See National Western Life Insurance Co. v. Commodore Cove*, 678 F.2d 24, 26 (5th Cir.1982) (quoting *Kite v. Marshall*, 661 F.2d 1027, 1030 (5th Cir.1981)); *Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir. 1980); *see also Horizon Concepts, Inc. v. City of Balch Springs*, 789 F.2d 1165, 1167 (5th Cir.1986). In the case *sub judice*, the plaintiff appears to argue that the Levee Board maintenance policy not only deprived him of the use of his property subject to the levee easement without proper compensation, but also disqualified him from being considered as a maintenance contractor on his own land based on arbitrary grounds. The plaintiff asserts that the standards set out in the policy itself are vague and arbitrary and that too much discretion in choosing who will be a maintenance contractor on the plaintiff's land is vested in the Chief Engineer, Newman Bolls. The plaintiff does not assert that his procedural due process rights have been violated.

In analyzing whether the maintenance policy is arbitrary and capricious, the court must first look to the goal that is to be achieved by the Levee Board as set forth by the Legislature. Section 3 of Chapter 1 of the Laws of 1865 provides in pertinent part that the Levee Board has the power to "make all needful regulations, and do all acts necessary in their opinion to secure

---

10. Although dicta in *Reynolds* implies that a landowner has no rights in land burdened with levee easements, the constitutional issues that are presented in the instant case were not raised in *Reynolds*, and *Reynolds* gives no directive as to how the Mississippi Supreme Court would address these issues.

472

the counties under their charge from the overflow of the waters of the Mississippi River." To fulfill this goal, the Levee Board is charged with, among others, the duty of maintaining the levee. With this statement of the legislative goal in mind, the court must determine whether the maintenance policy as written or as it has been applied is a rational means for furthering this legislative purpose and whether this means is either arbitrary or unreasonable. *See United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127–28 (5th Cir.1981).

■ The plaintiff contends that the policy is replete with subjective qualifications that provided no guidance to him as a potential contractor as to the requirements for the award of the contract. As an example, the plaintiff cites the language in the policy that the applicant must be "able to satisfy the Board" that he is capable of maintaining the levee in accordance with contractual requirements. When one looks to the contract, however, it becomes evident what is required. The applicant must be able to place sufficient cattle on the levee, must have access to sufficient equipment to mow the levee and control the growth of weeds and undergrowth, must be able to build and maintain fences, and be able to move the cattle when necessary. Although the court is of the opinion that the "able to satisfy the Board" language is somewhat unclear and that a more precise standard would be better, it is not the court's opinion that this standard is so vague that it renders the policy as written to be wholly arbitrary. Also, the requirements listed in the contract are rationally related to the goal of properly maintaining the levee.

The requirement in the policy that the contractor must have proper equipment, although redundant with the contractual requirement noted above, is also rationally related to assuring that the levee is adequately maintained.

The third policy requirement is that:
Board must be satisfied that application is not submitted for purpose of

transfer to some unknown person and Board will not necessarily recognize such transfer.

As written, this standard may be rationally related to the goal of maintaining the levee in that it works to prevent "unknown" irresponsible people from obtaining maintenance contracts and then not fulfilling the contractual obligations.

■ The remaining portions of the policy are not challenged. What is challenged, however, are the factors that are considered that are not listed in the levee maintenance policy. One factor that is listed on the contract application and considered in the selection of a contractor is whether the applicant is in the cattle business. Another factor that Bolls testified would have been dispositive of the plaintiff's application in the instant case is that the plaintiff wanted to transfer the contract to a third party; Bolls then changed his position and stated that it would be possible for the plaintiff to transfer the contract if the transferee were someone that he recognized to be competent. The court is of the opinion that this unwritten discretionary standard provides no measure of certainty and appears to be based on Bolls' own subjective determination of who is competent.

■ The subjectivity of the standards for obtaining a maintenance contract is further evidenced by Bolls' testimony. Bolls testified that the fact that the plaintiff owns the land upon which the subject maintenance contracts exist would not be significant in determining whether he would receive the contract. Bolls does apparently, however, place greater weight on whether an applicant owns the cattle that are to graze on the subject land and on whether the applicant intends to make a profit from leasing the grazing rights. Bolls testified that other unwritten factors might also be considered. What is significant or insignificant in each case appears to be based on Bolls' personal discretion. While guidelines do exist, it appears that Bolls can pick and choose which of the guidelines are relevant and how they

should be weighed. Also, he can create new unwritten guidelines as needed. The court is of the opinion that such broad discretion renders the maintenance policy arbitrary.[11] The vesting and exercise of such broad discretion in the Chief Engineer is not rationally related to the goal of adequately maintaining the levee. Guidelines in such a case should be objective and possess a measure of certainty, not subjective and based on undefined reasons. *See Richardson v. McFadden,* 540 F.2d 744, 751 (4th Cir.), *reh'g denied,* 563 F.2d 1130, *cert. denied,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1976). The absence of use of objective standards in the instant case has no rational justification. The due process clause was designed to prevent arbitrary decision making that can infringe constitutionally protected rights. *Phillips v. Vandygriff,* 711 F.2d 1217, 1227 (5th Cir.1983). The defendants have cited no rational basis for vesting such unfettered discretion in the Chief Engineer, and the court is of the opinion that this broad discretion combined with the Levee Board's exclusion of the landowner from using his property without compensating him results in an arbitrary infringement of the plaintiff's property rights.

The court further recognizes the Levee Board's right to take private property for public use but also recognizes that when private property is taken without proper compensation, the landowner has been deprived of his due process rights. In this vein, the Court of Appeals for the Sixth Circuit has stated:

> The government has the right to take private property for public uses as an attribute of Sovereignty. However, under our constitution it is a condition of the exercise of this authority that just compensation be paid. When a government takes private property without payment of just compensation it does not commit a mere trespass, the typical property tort. Rather, it abuses one of its Sovereign powers and even though the requirements of procedural due process may be scrupulously observed, there has been a deprivation of due process in the sense of fundamental fairness or 'natural ability.'

*Gordon v. City of Warren,* 579 F.2d 386, 390 (6th Cir.1978). *See also Lenoir v. Porters Creek Watershed Dist.,* 586 F.2d 1081, 1095 (6th Cir.1981).

In the instant case, it is clear that the landowner's grazing rights have been appropriated by the Levee Board without any form of compensation. The Levee Board asserts that the taking of the grazing rights is proper because it is economically efficient and because it needs to be able to exercise control over the contractors. The court is of the opinion that economic efficiency cannot be validly asserted as a justification for taking private property without just compensation. *Cf. Wise v. Yazoo City,* 96 Miss. 507, 51 So. 453 (1910). Nor does the need for control over the contractors justify such a taking. The Levee Board may exercise the necessary supervisory control over the landowner in maintaining the levee as it does over the contractors it would chose to maintain the levee.

### Standing

The defendants assert that the plaintiff lacks standing to challenge the constitutionality of the use of the maintenance policy to deprive the plaintiff of the enjoyment of his land without just compensation because the plaintiff never applied for a maintenance contract. In the instant case the facts show that the plaintiff's use and enjoyment of his land would have been appropriated by the Levee Board without compensating the plaintiff even if the plaintiff had applied for a maintenance contract.

---

**11.** This case must be contrasted with *United States v. 0.16 of an Acre of Land,* 517 F.Supp. 1115, 1122 (E.D.N.Y.1981). In that case broad discretion vested in the Secretary of Interior was held not to be arbitrary because the Secretary's discretion was limited by regulations and by the clearly express purposes and guidelines in the statute. Such clear standards do not exist in the instant case. Moreover, those standards that do exist may apparently be ranked and given whatever relative weight that the Chief Engineer deems they deserve.

The plaintiff testified that he would have applied for a maintenance contract so that he could enjoy making profits from his own land but decided that it would be futile to apply for the contract based on the criteria in the maintenance policy and on representations by Bolls. Under these facts, the court is of the opinion that the plaintiff's failure to submit a maintenance contract application does not bar him from maintaining a § 1983 cause of action. *Cf. Taylor v. Hudson Pulp and Paper Corp.*, 788 F.2d 1455, 1462 (11th Cir.1986); *Southbridge Plastics Division v. Local 759*, 565 F.2d 913, 917 (5th Cir.1978).

### Administrative Procedures Act

The plaintiff has also claimed that the Levee Board has violated the Mississippi Administrative Procedures Act, Miss.Code § 25-43-1, *et seq.* (1977). Inasmuch as the relief sought in this claim has heretofore been granted by the court on other grounds, the court deems it unnecessary to address the issues raised under this claim. Furthermore, the statute of limitations on this claim appears to have run pursuant to Miss.Code § 25-43-7(3).

### Damages

 The court is of the opinion that the plaintiff owner of the fee is entitled to compensation for the taking by the defendant Levee Board that is beyond the scope of its easement. The court hereby orders that the plaintiff is entitled to recover of and from the defendant Levee Board in the amount of $5.17 [12] per acre per year from April 2, 1982 until the date hereof.[13]

The defendant is further enjoined from appropriating grazing privileges from the plaintiff without just and reasonable compensation.

The court is of the opinion that the plaintiff is entitled to an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988, and he shall submit a statement of

the same to this court within 20 days hereof. In making the submission, plaintiff should include the factors listed in *Nisby v. Commissioners Court of Jefferson County*, 798 F.2d 134 (5th Cir.1986).

The plaintiff is enjoined from using subject lands in any manner that is inconsistent with the defendant's levee easement. A separate judgment shall be entered pursuant to Rules 52 and 58 of the Federal Rules of Civil Procedure.

---

**12.** This is the average rental that has been paid to the Board of Levee Commissioners of the Yazoo District, that owns the fee simple title to levee lands, for the years 1982 through 1986.

**13.** No immunity issue has been raised by the parties, thus the question is not properly before the court and will not be addressed.