**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

WEYERHAEUSER COMPANY,

Plaintiff-Appellee,

v.

CARL BRANTLEY,

Defendant-Appellant.

No. 06-7097

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. NO. CV-05-382-RAW)**

Brandon L. Jensen (Karen Budd-Falen with him on the briefs) Budd-Falen Law Offices, LLC, Cheyenne, Wyoming, for Appellant.

Frederick C. Cornish (William S. Leach and Alison A. Verret with him on the brief) Eldridge Cooper Steichen & Leach PLLC, Tulsa, Oklahoma for Appellee.

Before **McCONNELL**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Weyerhaeuser is the record owner of 300 acres known as Sherrill Farm in McCurtain County, Oklahoma. This appeal arises from Weyerhaeuser's suit to remove Carl Brantley and his livestock from Sherrill Farm. As an affirmative

defense to Weyerhaeuser's suit, Brantley sought ownership of Sherrill Farm through adverse possession or, in the alternative, a prescriptive grazing easement on the entire farm. After a bench trial, the district court denied Brantley's property claims and awarded damages and attorney's fees to Weyerhaeuser.

Having jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1291, we AFFIRM.

## I. Background

### A. *Factual Background*

Sherrill Farm is located in a scenic portion of southeastern Oklahoma, along the Mountain Fork River and near the Arkansas border. The area has historically been a farming and ranching district, with some gravel mining and timber operations. The record does not indicate how long Weyerhaeuser has owned Sherrill Farm, but the parties stipulate Weyerhaeuser is the current record owner and has been at all times relevant to this dispute, which goes back to the early 1980s. The facts in dispute center on whether Brantley had exclusive use of Sherrill Farm for fifteen years.

Brantley claims he began grazing livestock on Sherrill Farm as early as 1980–81, though he never had permission to use it.[1] Since then, Brantley claims he built corrals, feed troughs, and fences on the property. He also removed brush, applied fertilizer, harvested wheat, and maintained roads. Although he installed a

_____

[1] From 1994 to 2004, Brantley had a license from Weyerhaeuser to graze property near Sherrill Farm, but he never had permission to use Sherrill Farm.

-2-

locked gate on the farm in the early 1980s, he never paid property taxes on the land. Brantley claims his adverse possession of Sherrill Farm began in the winter of 1987–88, after Weyerhaeuser last harvested a stand of trees on the property.

During and after the years when Weyerhaeuser was using the area for its timber operations, Weyerhaeuser also permitted a number of other uses on Sherrill Farm. Brantley's father, Bobby, for example, had a license agreement to graze on Sherrill Farm beginning in 1983. The parties disagree how long Bobby leased grazing rights on Sherrill Farm, but the district court found Bobby had a license with Weyerhaeuser until 1992. Brantley maintained his father was no longer using Sherrill Farm by the winter of 1987–88. Brantley's brother Ricky and his wife, Cindy, also asserted adverse possession of Sherrill Farm based on their grazing activities during this time, but they ultimately reached a settlement with Weyerhaeuser, and the parties stipulated Ricky and Cindy had no lawful claim.

Starting in 1987, Weyerhaeuser also leased parts of Sherrill Farm to Oklahoma State University ("OSU"). OSU planted two research sites in the southern part of Sherrill Farm but made no use of the northern half. OSU complained to Weyerhaeuser about damage to its research plantations from livestock and built a fence to protect the plantations, but it did not seek to have Brantley's cattle removed from Sherrill Farm entirely. OSU did request that

-3-

Brantley cease grazing in the leased area, but Brantley was uncooperative. OSU also maintained its own locked gate to Sherrill Farm. Because of this alternative access, Brantley's gate never prevented OSU or Weyerhaeuser from accessing Sherrill Farm.

In 1998, Weyerhaeuser and the Oklahoma Department of Wildlife Conservation ("ODWC") agreed to include Sherrill Farm in the Three Rivers Wildlife Management Area. According to the agreement, the general public could access Sherrill Farm for hunting, fishing, and other recreation. Brantley's locked gate nevertheless prevented a state wildlife officer from accessing Sherrill Farm during some visits. Brantley testified he saw hunters on the property during this time and asked them to leave.

In 2003, Weyerhaeuser granted an easement to another landowner to access her property across Sherrill Farm, but Brantley refused to allow access to the easement through his gate.

OSU's lease terminated in 2004. A Weyerhaeuser employee testified Weyerhaeuser had plans to put Sherrill Farm back in timber production at that time and to begin gravel mining. Weyerhaeuser argues Brantley's presence on the land delayed these activities, resulting in monetary damages.

### B. Procedural Background

In 2005, Weyerhaeuser sued two of Brantley's relatives for trespass.  It later amended the complaint on January 31, 2006, to include claims against Brantley for trespass, ejectment, and declaratory relief.  Brantley asserted adverse possession or prescriptive easement as affirmative defenses, arguing that his grazing use since 1987 entitled him to the property.  After a bench trial, the district court entered judgment in favor of Weyerhaeuser.

## II.  Discussion

"In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo."  *Keys Youth Servs. v. City of Olathe*, 248 F.3d 1267, 1274 (10th Cir. 2001).  In this diversity case, we apply Oklahoma law.

The district court determined Brantley's defenses failed because his possession had not been exclusive for the fifteen-year prescriptive period, which required Brantley to establish the elements of either adverse possession or a prescriptive easement since prior to 1991.  *See* Okla. Stat. tit. 12, § 93(4).  Specifically, the court found, among other things, Sherrill Farm had been subject to Bobby Brantley's grazing license until 1992 and that OSU and Weyerhaeuser had also conducted activities on Sherrill Farm incompatible with Brantley's exclusive possession.

The district court also determined Weyerhaeuser suffered $10,000 in damages because it was not able to resume timber operations in 2004 due to Brantley's grazing activities. The court, however, rejected Weyerhaeuser's claim for mining damages as speculative. It also granted attorney's fees pursuant to Oklahoma statute.

We agree with the district court that Brantley is not entitled to adverse possession or a prescriptive easement. We also affirm the damage award, but we conclude Oklahoma law does not authorize attorney's fees.

## A. *Adverse Possession*

Under Oklahoma law, "[t]o establish adverse possession the claimant must show that possession was [1] hostile, [2] under a claim of right or color of title, [3] actual, [4] open, [5] notorious, [6] exclusive, and [7] continuous for the full statutory period [of fifteen years]." *Francis v. Rogers*, 40 P.3d 481, 485 (Okla. 2001); *see* Okla. Stat. tit. 12, § 93(4). The burden of proof in adverse possession cases is "clear and positive" proof with "all inferences and presumptions [] in favor of the rightful owner." *Norman v. Smedley*, 363 P.2d 839, 843 (Okla. 1961). Adverse possession, moreover, cannot be permissive: "permissive possession can never ripen into title against anyone." *Zimmerman v. Newport*, 416 P.2d 622, 629 (Okla. 1966).

### 1. *Findings Support Rejection of Adverse Possession Defense*

The district court made a number of findings that fatally undercut Brantley's adverse possession claim. For instance, the court emphasized Brantley never paid taxes on Sherrill Farm and cited *Anderson v. Francis*, 57 P.2d 619, 622 (Okla. 1936): "The payment of taxes is not a controlling circumstance, but it is one of the means whereby a claim of ownership is asserted, and the failure to pay taxes for so long a time tends to weaken a claim of ownership by adverse possession." The court also found "[t]he boundaries of the land Carl Brantley claims to own by adverse possession have evolved to suit his purpose," Aplt. App. 208, and explicitly found Brantley's testimony was not believable when it conflicted with the testimony of other witnesses.

But the district court ultimately determined Brantley's adverse possession claim failed because his use was not exclusive for fifteen years. To meet the requirement of exclusivity, Brantley must "show an exclusive dominion over the land and an appropriation of it to his own use and benefit. Two persons cannot hold one piece of property adversely to each other at the same time, and where two persons have entered upon land, [the one] who has the better title will be deemed to be in possession." *Sears v. State Dep't of Wildlife Conservation*, 549 P.2d 1211, 1213 (Okla. 1976) (quotation omitted).

Based on the evidence produced at trial, the district court found a number of facts indicating Brantley shared the use of Sherrill Farm with others: (1) Brantley's father, Bobby, had a grazing lease on Sherrill Farm until 1992; (2) OSU conducted significant activities on Sherrill Farm during the relevant period; (3) Weyerhaeuser also conducted activities such as road maintenance and gravel sampling during the relevant period; (4) by agreement with Weyerhaeuser, Sherrill Farm is part of an area managed by the ODWC; (5) under the ODWC agreement, Sherrill Farm is open to the public and hunters have used the property; (6) horses not belonging to Brantley ran on Sherrill Farm; and (7) Brantley's brother also claimed grazing rights to Sherrill Farm by adverse possession.

We agree with Weyerhaeuser that these findings support the district court's conclusion Brantley did not use Sherrill Farm to the exclusion of the record owner and other permissive users.

### 2. Findings Support Rejection of Partial Adverse Possession Defense

As a fallback position, Brantley claims even if others used the southern part of Sherrill Farm, he maintained exclusive possession of the northern part and has proven adverse possession at least to that portion of Sherrill Farm. Under Oklahoma law, an adverse possessor can gain title to a portion of land he possesses exclusively even if the record owner makes use of another portion of the land. *See Macias v. Guymon Indus. Found.*, 595 P.2d 430, 434 n.8 (Okla.

1979) ("Where true title holder enters a part of his land adversely occupied by another, the statute of limitations will be arrested only as to so much of the land as has been entered and adverse possessor will be restricted to that land of which he remains in actual possession.").

Here, the findings support the district court's judgment. While the district court's findings were not entirely clear as to what portions of Sherrill Farm were being used by Weyerhaeuser and OSU, the record shows that, at the very least, Bobby Brantley's grazing lease, which the district court found extended to 1992, covered the whole of Sherrill Farm. And, as detailed above, other users claimed access and use of the northern portion of Sherrill Farm. Moreover, Brantley never clearly defined the boundaries of his use in a way that would have supported his partial exclusive possession.

These findings defeat Brantley's claim of partial exclusivity.

### 3. Findings Were Not Clearly Erroneous

Brantley's primary response to these conclusions is that the district court clearly erred in its factual determinations regarding other users of Sherrill Farm. In particular, he argues the district court clearly erred in finding his father had a grazing license on Sherrill Farm until 1992. "A finding of fact is 'clearly erroneous' if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has

been made.  We view the evidence in the light most favorable to the district court's ruling and must uphold any district court finding that is permissible in light of the evidence."  *Plaza Speedway, Inc. v. United States*, 311 F.3d 1262, 1266 (10th Cir. 2002).  The evidence supports the district court's finding.

The only license agreement in the record between Brantley's father, Bobby, and Weyerhaeuser is a one-year agreement terminating April 6, 1984.  Brantley does not argue the license was never renewed and indeed seems to acknowledge the license was renewed for some period, because he stipulates Bobby would testify he can no longer recall the number of years for which he renewed his grazing license for Sherrill Farm.  He simply argues Bobby had left Sherrill Farm by at least 1987.  Weyerhaeuser did not retain records regarding the license renewal because it periodically destroys files after they have been closed for some time.

Several pieces of evidence suggest Bobby's grazing license extended to a later date.  For example, a Weyerhaeuser witness testified her records showed Bobby's grazing license continued until 1992 based on a document dated September 14, 1992, showing a grazing license on the Sherrill Farm area had been terminated.  The 1989 lease agreement with OSU also states the "leased premises are currently subject to a special cattle grazing license agreement between Lessor and a third party, Lessee is agreeable to the continuation of said license

agreement to July 1, 1992, at which time Lessor shall terminate said license agreement." Aplt. App. 410. The district court noted OSU's behavior in not seeking to have cattle removed from the property was consistent with an understanding that Weyerhaeuser allowed a licensee to use the property for grazing. Based on this evidence, the district court concluded Bobby Brantley had a license to graze on Sherrill Farm until 1992.

Brantley argues the district court clearly erred because, according to his testimony and the stipulated testimony of Bobby, Bobby was no longer using Sherrill Farm after 1987. The district court noted "when the testimony diverged, the Court examined the demeanor of each witness and the consistency of all the testimony at trial in evaluating the discrepancy." Aplt. App. 194 n.3. With regard to the term of Bobby Brantley's grazing license, the district court chose to credit other evidence over Brantley's testimony. Given the district court's role in assessing the credibility of witnesses and the other evidence in the record, this determination was not clearly erroneous.

Brantley does not seriously contest the court's other factual findings. They also are supported by the record and are not clearly erroneous.

\* \* \*

Accordingly, the district court correctly concluded that, because Brantley had not exclusively possessed Sherrill Farm for the required time, he had not established a claim for adverse possession.

## B. *Prescriptive Easement*

The district court also concluded Brantley had "failed to demonstrate the necessary elements to succeed on a claim of an easement by prescription" because "[t]he requirements for an easement by prescription in the state of Oklahoma are generally the same as those for adverse possession." Aplt. App. 210 (citing *Zimmerman*, 416 P.2d at 629); *see also Brown v. Mayfield*, 786 P.2d 708, 712 (Okla. Civ. App. 1989) (requiring "clear and positive proof of actual open, notorious, exclusive and hostile possession"). Although the district court's order is not entirely clear on this point, it rejected the prescriptive easement claim, like the adverse possession claim, because Brantley's use was not exclusive for the prescriptive period.

As an initial matter, it is not entirely clear Oklahoma law would even entertain a prescriptive easement for grazing. But assuming—as the district court did—that Oklahoma will recognize such an easement, a more subtle analysis of exclusivity is required than that employed in a typical adverse possession case.

### 1. *Prescriptive Grazing Easements*

Although Oklahoma has not explicitly ruled on the question, a number of courts have rejected claims for prescriptive grazing rights. These courts see the claimed easement (which more or less uses all of the servient estate) as a thinly veiled attempt to circumvent the requirements for adverse possession. *See McDonald v. Bd. of Miss. Levee Comm'rs*, 646 F. Supp. 449, 469 (N.D. Miss. 1986); *Platt v. Pietras*, 382 So. 2d 414, 416–17 (Fla. Dist. Ct. App. 1980); *Oakley Valley Stone v. Alastra*, 715 P.2d 935, 938 (Idaho 1985); *Burlingame v. Marjerrison*, 665 P.2d 1136, 1140 (Mont. 1983); *Deseret Livestock Co. v. Sharp*, 259 P.2d 607, 610 (Utah 1953).

Some courts rejecting prescriptive grazing rights instead analyze grazing rights as falling under the doctrine of profits à prendre, a more expansive type of property right. *See McDonald*, 646 F. Supp. at 444–69; *Platt*, 382 So. 2d at 417; *Oakley Valley Stone*, 715 P.2d at 938; *Burlingame*, 665 P.2d at 1139–40; *Deseret Livestock*, 259 P.2d at 610. A profit, in contrast to an easement, is a type of possessory interest: it "is a liberty in one person to enter another's soil and take from it the fruits not yet carried away." 25 Am. Jur. 2d Easements and Licenses § 3; *see also Bonner v. Okla. Rock Corp.*, 863 P.2d 1176, 1181–82 (Okla. 1993) (distinguishing easements from profits à prendre). A profit is an easement "plus"; common examples include the right to enter and remove timber, minerals, oil, gas,

or game from the burdened property. Restatement (Third) Property (Servitudes) [Restatement] § 1.2(2) & cmt. a.

These cases considering claims for prescriptive grazing rights have rejected them whether analyzed as a profit or an easement when the right claimed approximates total possession. As the Montana Supreme Court reasoned in *Burlingame*, the claimed prescriptive grazing right—either profit or easement—would have the effect of leaving the landowner with an "empty" fee title. 665 P.2d at 1140. In other words, where an easement or profit would amount to possession of an entire parcel, the claim is not one of prescriptive right but actually of adverse possession. In that situation, one cannot gain rights to the profits of the land through a claim of prescription but instead must meet all of the requirements of adverse possession. *Id.*; *see also Platt*, 382 So. 2d at 417; *Oakley Valley Stone*, 715 P.2d at 937–38; *Deseret Livestock*, 259 P.2d at 610. In short, if the property right claimed is the functional equivalent of possession, a prescriptive easement is not available, because it would effectively oust the rightful owner from the property. *See Platt*, 382 So. 2d at 417; *Oakley Valley Stone*, 715 P.2d at 938. Because the rights Brantley asserts approximate total possession, the preceding line of cases, if followed by Oklahoma, would deny Brantley a prescriptive easement for grazing rights.

Other lines of authority, however, suggest grazing easements may be acquired by prescription. The Colorado Supreme Court, for example, recently recognized a prescriptive easement to graze livestock based on an historical right to access Spanish Land Grant property. *See Lobato v. Taylor*, 71 P.3d 938, 954–55 (Colo. 2002) (relying on historic use and grant documents); *see also Checketts v. Thompson*, 152 P.2d 585 (Idaho 1944); *Schwenker v. Sagers*, 230 N.W.2d 525, 528 (Iowa 1975) (both recognizing prescriptive easements for grazing on a narrower scale). And the other cases cited above stop short of concluding that one can never obtain a profit or easement to graze by prescription.

To summarize, many courts have been wary of granting prescriptive property rights for an easement or profit amounting to total possession of a parcel. Most courts nevertheless recognize at least the *possibility* of a prescriptive easement to graze cattle on another's property. Oklahoma statutes and case law are silent on this point. Given the basic principle that "[a]ny easement which may be acquired by grant may also be acquired by prescription, in the absence of a statute to the contrary," 25 Am. Jur. 2d Easements and Licenses § 43, we will assume the possibility that a prescriptive easement could be obtained for grazing under Oklahoma law. *See* Okla. Stat. tit. 60, § 49 (identifying the "right of pasture" as an easement).

-15-

## 2. *Whether Brantley's Claimed Use was Exclusive*

We now turn to the district court's determination that Brantley's claimed use was not exclusive for the purpose of establishing a prescriptive easement.

Certain analytical difficulties flow from Oklahoma's retention of exclusivity as an element of prescriptive easements. An easement is by definition a non-exclusive interest in land. *See* Restatement § 1.2(1) ("An easement creates a nonpossessory right to enter and use land in the possession of another."). Comments to the Restatement discussing prescriptive easements describe how they differ from adverse possession: "To acquire an interest by adverse possession, the claimant must maintain exclusive possession of the claimed property during the statutory period. To acquire a servitude, however, the claimant is only required to use the property during the prescriptive period. The use need not be, and frequently is not, exclusive." Restatement § 2.17 cmt. a.

Some states nevertheless continue to refer to exclusivity as an element of prescriptive easements. *See*, *e.g.*, *Albert v. Hastetter*, 48 P.3d 749, 754 (Mont. 2002); 25 Am. Jur. 2d Easements and Licenses § 53 ("[E]xclusive use generally is a prerequisite to the establishment of a prescriptive easement."). Because Oklahoma references the elements of adverse possession in its definition of a prescriptive easement, Oklahoma is among the states retaining an exclusivity requirement. *See Willis v. Holley*, 925 P.2d 539, 540–41 (Okla. 1996) ("To

-16-

acquire possession by prescription the 'possession must be open, visible, continuous, and *exclusive*, with a claim of ownership, . . .' actual, notorious, and hostile.") (citing *Zimmerman*, 416 P.2d at 629), and quoting *Irion v. Nelson*, 249 P.2d 107, 108 (Okla. 1952)) (emphasis added).  Nevertheless, Oklahoma has not explained exactly what exclusive means in the context of a prescriptive easement.

Comments to the Restatement describe the difficulty of defining exclusive in this context: "The term 'exclusive,' borrowed from adverse-possession doctrine, causes confusion in prescription cases because servitudes are generally not exclusive."  Restatement § 2.17 cmt. g.   The exclusivity requirement in prescriptive easement cases thus "puts courts into the awkward position of explaining that the requirement does not mean that the use is such as to exclude others, or, that the user in fact has excluded others from the servient estate."  *Id.*

Instead, courts must apply a different understanding of exclusivity.  Courts explain exclusivity "simply requires that the user have acted independently of rights claimed by others."  *Id.*; *see also* 25 Am. Jur. 2d Easements and Licenses § 53 ("The term 'exclusive' does not mean that the easement must be used by the claimant only, however; it simply means that the claimant's right to use the easement does not depend on a similar right in others.").  "The exclusivity requirement is most often applied to deny prescriptive rights to one whose use is indistinguishable from uses being made by the general public. . . . [or] to one

-17-

whose use is similar to and concurrent with a use made by the owner."

Restatement § 2.17 cmt. g.  Most typically, then, exclusivity in the context of

prescriptive easements connotes a use different than that of others on the

property.

The Restatement acknowledges this reading of the exclusivity requirement

can be "redundant" because "it serves a notice function already served by the

open-or-notorious requirement." *Id.*  For example, Brantley's adverse use would

be neither open and notorious nor exclusive if he used the easement along with

the public or another person who was entitled to graze on the property.  This is

because his use would not give Weyerhaeuser notice that Brantley, and not an

authorized user, was grazing on Sherrill Farm.

In sum, to be exclusive in the prescriptive easement context, a use need not

physically exclude others from the land, but *it must at least be sufficiently distinct*

*from the uses made by authorized users to give the owner notice of a potential*

*claim*.

With this background, we turn to whether the district court erred in

concluding Brantley's claimed easement was sufficiently exclusive to establish a

prescriptive easement.  Applying these principles, we see no error.  In particular,

as discussed above, the district court found Bobby Brantley held a grazing license

on the Sherrill Farm until 1992.  If Bobby Brantley had a license to graze cattle

on the Sherrill Farm until 1992, Brantley was not the exclusive user of the Sherrill Farm for grazing prior to that date. And, until at least 1992 his grazing use was not sufficiently distinct from his father's licensed use to put Weyerhaeuser on notice that Brantley was claiming a grazing easement separate from his father's license. The court, moreover, also concluded that other members of the Brantley family used and claimed rights to graze on Sherrill Farm. And it is also clear that a substantial portion of Sherrill Farm was used by OSU, and then by ODWC.

Accordingly, the district court did not err in concluding Brantley's use of Sherrill Farm for grazing was not sufficiently exclusive for the full prescriptive period to establish a prescriptive grazing easement under Oklahoma law.

## C. *Damages*

Brantley argues Weyerhaeuser is not entitled to the damages it received for three reasons: (1) Weyerhaeuser failed to plead special damages under Federal Rule of Civil Procedure 9(g); (2) the damages awarded were excessively speculative and uncertain; and (3) Weyerhaeuser failed to mitigate its damages. The district court did not abuse its discretion by allowing Weyerhaeuser to amend its pleadings by pleading special damages in the pretrial order. We affirm the district court's damage award.

-19-

### 1. Failure to Plead Special Damages

Rule 9(g), covering pleadings, requires that "[w]hen items of special damage are claimed, they shall be specifically stated." Special damages depend on particular circumstances of the case; general damages, on the other hand, are the ordinary result of the conduct alleged. 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1310 (3d ed. 2005). Thus, general damages for trespass would be injury to the land itself.[2] Restatement (Second) of Torts § 929. Lost profits, by contrast, are special damages subject to the pleading requirement of Rule 9(g) because they depend on circumstances unrelated to the trespass, i.e. Weyerhaeuser's plans for the property. *See Quinones v. Penn. Gen. Ins. Co.*, 804 F.2d 1167, 1170 (10th Cir. 1986).

Brantley claims Weyerhaeuser failed to adequately plead its damages attributable to lost profits. Weyerhaeuser did not describe lost profits from timber or mining in its complaint. Instead, it first raised lost profits as a measure of damages in a response to Brantley's motion to dismiss for lack of subject matter jurisdiction. Weyerhaeuser argues it complied with Rule 9(g) by amending its pleadings through the pretrial order and that Brantley suffered no prejudice

---

[2] Weyerhaeuser's general damages arguably include "loss of use of the land," as measured by the rental value of the land for grazing purposes. Restatement (Second) of Torts §§ 929, 931. Weyerhaeuser did not request and the district court did not award damages on this basis.

through the amended pleading because he otherwise had notice of the special damages claim.

Federal Rule of Civil Procedure 15(a) allows a party to amend its pleadings at any time by leave of the court. The subsequent pretrial order supercedes the pleadings. *See Wilson v. Muckala*, 303 F.3d 1207, 1216 (10th Cir. 2002) (calling a new claim raised in a pretrial order "obviously an attempt to amend the pleadings at a rather late date"). Although the court never explicitly permitted an amended pleading, it implicitly rejected Brantley's argument that special damages had not been pleaded in denying Brantley's motion to dismiss. Brantley, moreover, did not object to Weyerhaeuser's theory of damages in the pretrial order. Given the district court's broad discretion to conform the pleadings to the arguments raised by the parties, the court did not abuse its discretion by permitting a late amendment in this case.

### 2. *Sufficiency of the Evidence*

Oklahoma law prohibits recovery of damages that are uncertain and speculative. *See Great Western Motor Lines, Inc. v. Cozard*, 417 P.2d 575, 578 (Okla. 1966). As a general rule, anticipated profits "are too remote, speculative, and dependent upon uncertainties and changing circumstances to warrant a judgment for their loss." *City of Collinsville v. Brickey*, 242 P. 249, 253 (Okla. 1925). To recover damages for lost profits, a plaintiff must therefore demonstrate

"the fact of damage . . . with reasonable certainty," and the "amount of damages may not be based upon mere speculation and conjecture." *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 425–26 (10th Cir. 1952); *see also City of Collinsville*, 242 P. at 253; 22 Am. Jur. 2d Damages § 443.

Weyerhaeuser claimed lost profits on two theories, one for timber sales and one for gravel mining. The district court rejected as speculative Weyerhaeuser's claims for lost profits on gravel mining ($200,000) but accepted its proof of lost profits on tree farming ($10,000). We agree with the district court.

Weyerhaeuser's damage claims were based on the testimony of an in-house forest manager. He testified as to gravel mining that, but for Brantley's cattle, Weyerhaeuser would have netted $200,000 in profits, "based on a startup of about 150,000 tons the first year and 300,000 tons the second year and they calculated that based on the current market value of those minerals." Aplt. App. 289. As to timber sales, he opined at trial that "just from not being able to grow trees on there the last two years," Weyerhaeuser lost "just under $10,000." Aplt. App. 288. Weyerhaeuser says this figure for timber profits was based on a projected profit of $66 per acre attested to in an affidavit the forest manager provided in response to Brantley's motion to dismiss.

In awarding damages only for lost timber profits, the district court distinguished between the testimony on timber and gravel based on the expertise

of the witness: because the witness was a forest manager, he was competent to testify about trees but not about gravel. The court identified a hearsay problem with the gravel testimony because the witness testified that other people prepared the gravel calculations. The court furthermore found the witness "provided no documentation in support of his allegations as to the amount of mineral development on Sherrill Farm, the costs to Weyerhaeuser as to the mineral development or the lost profit from the mineral development." Aplt. App. 207.

We agree that the evidence Weyerhaeuser presented regarding lost mining profits was too uncertain and speculative to support a damage award. As to timber sales, however, adequate competent evidence was presented to support the award of damages. First, Weyerhaeuser had previously used the property for timber harvesting, as recently as 1987. Second, the property was currently suitable for planting and harvesting; part of OSU's research on the Sherrill Farm included tree plantations. Third, Weyerhaeuser's witness was its Oklahoma area manager for timberlands, who testified he is "in the business of growing trees," is a certified forester, and has worked in forestry for Weyerhaeuser for thirty-five years. Aplt. App. 282. Finally, the forest manager submitted an affidavit to the court that identified a methodology for his damage calculations. While the district court's order could have been more specific, the forest manager's testimony was adequate to provide reasonable grounds to support the order.

In short, the district court did not clearly err in its award of $10,000 in damages for lost timber profits.

### 3. *Mitigation of Damages*

Brantley argues Weyerhaeuser should have mitigated damages by removing him from the land sooner, an odd position given that Brantley also claims a possessory right to the land and that he had no obligation to leave. At any rate, failure to mitigate is no defense unless Weyerhaeuser's conduct caused it to incur greater losses than it otherwise would have. Given Brantley's adverse possession defense, Weyerhaeuser could not have reduced its losses by asking him to leave. It had to sue for ejectment and trespass to achieve that result.

## D. Attorney's Fees

The final issue is whether Weyerhaeuser is entitled to attorney's fees as a prevailing party in this action. Under Oklahoma law, "In any civil action to recover damages for the negligent or willful injury to property and any other incidental costs related to such action, the prevailing party shall be allowed reasonable attorney's fees, court costs and interest." Okla. Stat. tit. 12, § 940(A). The district court awarded attorney's fees and costs to Weyerhaeuser on this authority.

The Oklahoma Supreme Court has interpreted § 940(A) as applying only to "those actions for damages for the negligent or willful *physical* injury to

property." *Woods Petroleum Corp. v. Delhi Gas Pipeline Corp.*, 700 P.2d 1011, 1013 (Okla. 1984). Brantley argues the district court's award was improper because Weyerhaeuser recovered only lost profit damages and did not recover damages for physical injury to the property. Weyerhaeuser argues trespass itself is physical injury to property because it requires a physical invasion, and Brantley's cattle did physically injure the property. We agree with Brantley.

Although trespass is a willful injury to property rights by physical invasion, the intermediate appellate court in Oklahoma has explicitly held § 940(A) does not apply where the plaintiff recovers only nominal damages on a trespass claim. *Stites v. Duit Constr. Co.*, 992 P.2d 913, 916 (Okla. Civ. App. 1999), *cert. denied* Nov. 10, 1999. The most natural reading of *Stites* leads us to conclude a prevailing party must recover actual damages for physical injury to property to recover attorney's fees under § 940(A), even in a trespass action. Weyerhaeuser did present evidence Brantley's cattle damaged trees on the property, but the district court did not award damages on that basis. Because Weyerhaeuser only recovered damages for lost profits and not for physical injury to its property, it is not entitled to attorney's fees.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment in favor of Weyerhaeuser and REVERSE the award of attorney's fees.

-25-