**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SONRISA HOLDING, LLC; LIVING
TRUST AGREEMENT OF MELODY L.
ORTEGA DATED JANUARY 21, 2002,

    Plaintiffs - Appellants,

v.

CIRCLE K STORES, INC.,

    Defendant - Appellee.

No. 19-1333
(D.C. No. 1:17-CV-00029-STV)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **PHILLIPS**, Circuit Judges.
_____

Plaintiffs owned real property (the "Impacted Properties") adjacent to Circle

K, Defendant's gas station. On or before June 8, 2011, gasoline spills from Circle K

migrated off-site by way of groundwater and contaminated the Impacted Properties.

By December 2013, Plaintiffs were in discussions to sell the Impacted Properties to a

developer, Trammell Crow Residential. Before finalizing the sale agreement,

Trammell Crow hired environmental consultants to evaluate any corrective measures

necessary to remediate the contamination. Terracon, one of the consultants,

recommended that Trammell Crow install a vapor barrier below any development at

---

[*] This order and judgment is not binding precedent, except under the doctrines of law
of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the Impacted Properties. In light of this recommendation, Plaintiffs agreed to place $300,000 in an environmental escrow to fund any remediation costs. Trammell Crow ultimately spent $183,210 from the environmental escrow to construct and install a vapor barrier at the Impacted Properties, and the remaining $116,790 was refunded to Plaintiffs.

Invoking diversity jurisdiction, Plaintiffs then sued Defendant for trespass and nuisance under Colorado law. *See* 28 U.S.C. § 1332. As relevant here, Plaintiffs sought damages for the following: (1) reduced sale proceeds in the amount of $183,210 ("remediation damages"); (2) transaction fees incurred in selling the Impacted Properties ("transaction fees"); and (3) lost opportunity costs in the amount of $353,291 resulting from the delay in the sale of the Impacted Properties ("lost opportunity costs"). While the district court granted summary judgment for Plaintiffs on their trespass claim, the court denied Plaintiffs' claims for damages and instead awarded $1.00 in nominal damages.

This appeal follows. Plaintiffs argue the district court erred in denying their remediation damages, transaction fees, and lost opportunity costs. Exercising jurisdiction under 28 U.S.C. § 1291, we address Plaintiffs' arguments in turn and affirm the district court. [1]

_____

[1] Although not a model of clarity, Plaintiffs do not appear to challenge the district court's grant of summary judgment for Defendant on their nuisance claim. But even if they did, affirmance would be proper. The district court granted summary judgment for Defendant on Plaintiffs' nuisance claim because Plaintiffs "failed to raise a genuine issue of fact with regard to causation and damages." For the reasons

I.

A. Remediation Damages

We turn first to Plaintiffs' contention that the district court erred in denying their claim for remediation damages. Plaintiffs' remediation damages consist of the $183,210 Trammell Crow took from the environmental escrow to install the vapor barrier. Although the district court granted summary judgment on Plaintiffs' trespass claim, the district court declined to award the remediation damages because Plaintiffs "failed to set forth evidence that the petroleum spill proximately caused the incurrence of the [r]emediation [d]amages." More specifically, the court declined to award remediation damages because Plaintiffs did not retain an expert to testify that the contamination necessitated the vapor barrier constructed by Trammell Crow. We review the district court's decision to require expert testimony for an abuse of discretion. *See Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1214 (10th Cir. 2004); *see also Oliver v. Amity Mut. Irrigation Co.*, 994 P.2d 495, 497 (Colo. App. 1999) (holding that whether expert testimony is required is a determination "committed to the sound discretion of the trial court").

Under Colorado law, "[d]amages available on a trespass claim can include not only diminution of market value, cost of restoration, and loss of use of the property, but also discomfort and annoyance to the property owner as the occupant." *Hawley v. Mowatt*, 160 P.3d 421, 426 (Colo. App. 2007). But a plaintiff must "present

---

provided herein, we agree. Plaintiffs did not present sufficient evidence with respect to their damages, and so, Plaintiffs' nuisance claim fails.

3

sufficient evidence of the actual damages incurred by them resulting from th[e] trespass," or the plaintiff is only entitled to nominal damages. *Sanderson v. Heath Mesa Homeowners Ass'n*, 183 P.3d 679, 684 (Colo. App. 2008). And as a general rule in tort actions, "the recovery of . . . damages is limited by the requirements that such damages be proximately caused by the tortious act, and that they be reasonably ascertainable." *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 872 (Colo. 2002).[2]

Here, the district court held that "whether the petroleum spill at Circle K proximately caused the [r]emediation [d]amages is beyond the common knowledge and experience of a juror." In reaching this conclusion, the district court explained "expert testimony is necessary to address issues such as the location and extent of the petroleum migration, the risk of vapor hazards, and the need for and cost of the vapor barrier system . . . ." Without such testimony, the court reasoned, "Plaintiffs cannot demonstrate that Circle K's contamination, rather than Plaintiffs' independent business decision to save the sales deal, was the proximate cause of the [r]emediation [d]amages" because "[i]f the petroleum leak from Circle K's Gas Station did not pose a vapor risk, or at least did not pose a risk requiring the vapor barrier, then Circle K did not proximately cause the [r]emediation [d]amages."

A court may require expert testimony where the question at issue is "not within the common knowledge and experience of ordinary persons." *Hice v. Lott*,

---

[2] In a diversity action, "what theories of causation are permissible and the general means permitted to establish causation" are governed by state law. *Hall v. Conoco, Inc.*, 886 F.3d 1308, 1316 n.6 (10th Cir. 2018) (quoting *Tingey v. Radionics*, 193 F. App'x 747, 760 (10th Cir. 2006) (unpublished)).

223 P.3d 139, 143 (Colo. App. 2009); *see also Truck Ins. Exch.*, 360 F.3d at 1214 (applying Colorado law and holding the district court could exercise its discretion to require expert testimony when the "question is beyond the experience of the average layperson"); *Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 81 (Colo. 2001) (explaining that "[e]xpert testimony is generally necessary to assist the trier of fact in determining the applicable standards [of care] because in most cases such standards are not within the purview of ordinary persons"). On the other hand, expert testimony is "unnecessary" if the question does not require "specialized or technical knowledge." *Hice*, 223 P.3d at 143.

The district court did not abuse its discretion in requiring expert testimony to establish causation in this case. Experts are routinely retained under circumstances similar to those presented here. *See Hall*, 886 F.3d at 1317 (holding "the district court could reasonably conclude that the long-term carcinogenic effects of benzene exposure lie outside the ken of common experience, requiring expert testimony"); *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1214 (10th Cir. 2002) (reasoning that the alleged effect of a drug "is not within the realm of ordinary experience" and therefore plaintiffs must present "scientific evidence" and "expert testimony"); *Cary v. Auto. Ins. Co.*, 838 F. Supp. 2d 1117, 1122 (D. Colo. 2011) (approving expert testimony because "[h]ow one tests for the presence of mold in a home, the results of such testing, and how best to remediate mold if it is present, are subjects that are beyond the typical knowledge and experience of a lay juror"). Indeed, though Plaintiffs ultimately failed to retain an expert, they acknowledged throughout the

5

litigation that expert testimony would be necessary to address issues of causation and damages with respect to installation of the vapor barrier. And Plaintiffs made these concessions for good reason—a lay juror cannot be expected to understand whether the contamination created a vapor risk, whether a vapor barrier was necessary to address that risk, and what a vapor barrier should cost. Because these issues are beyond the purview of a lay juror, we cannot say the district court abused its discretion in requiring Plaintiffs to present expert testimony with respect to their remediation damages.

Plaintiffs make three arguments to the contrary. First, Plaintiffs argue they did not need expert testimony because "a business owner" can testify about "business losses" and "lay testimony is sufficient to establish a loss in real estate profits." Next, Plaintiffs assert their remediation professionals could have testified, as lay witnesses, to the necessity and reasonableness of the vapor barrier. Finally, Plaintiffs contend they did not need to present expert testimony in their case in chief. Plaintiffs reason that, if Defendant challenged the necessity and reasonableness of the vapor barrier, they were entitled to rebut that testimony with a rebuttal expert. For the following reasons, Plaintiffs' arguments are unavailing.

Plaintiffs first suggest expert testimony was unnecessary because, as business owners, they were entitled to testify as to their own lost profits. Not so. We have held that a business owner may testify about business losses if: (1) "the owners had sufficient personal knowledge of their respective businesses *and* of the factors on which they relied to estimate lost profits" or (2) "the owners offered valuations based

6

on straightforward, common sense calculations." *Mooring Capital Fund, LLC v. Knight*, 388 F. App'x 814, 825 (10th Cir. 2010) (unpublished) (citing *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929–30 (10th Cir. 2004)). Neither is the case here.

Business ownership itself does not suggest Plaintiffs would have any concept of whether the $183,210 vapor barrier was necessary to remediate the contamination. Whether the contamination justified construction of a vapor barrier involves complex questions of petroleum migration and benzene exposure—concepts with which Plaintiffs have expressed no familiarity. *See Mooring Capital Fund*, 388 F. App'x at 825 (explaining the business owner "had no experience in land development" and thus did not have sufficient knowledge to qualify for the business-owner exception). Moreover, Plaintiffs did not compute the $183,210 in remediation damages using a straightforward, common sense calculation. The damages were based on an environmental consultant's technical opinion as to how best to remediate the contamination. Thus, Plaintiffs could not have competently testified as to the calculation of these damages.

Plaintiffs nevertheless argue "lay testimony is sufficient to establish a loss in real estate profits." As a general proposition, this is true. "An owner can testify to the value of his property without being qualified as an expert witness." *Vista Resorts, Inc. v. Goodyear Tire & Rubber Co.*, 117 P.3d 60, 69 (Colo. App. 2004). But the opinion must be "based upon proper considerations" and "derived from an

7

adequate knowledge of the nature, kind, and value of the property in controversy." *In re Marriage of Plummer*, 709 P.2d 1388, 1389 (Colo. App. 1985).

Here, Plaintiffs did not even pretend to calculate their remediation damages based on a diminution of the Impacted Properties. They offered no evidence that, prior to the contamination, the Impacted Properties appraised at a particular amount, and after the contamination, that value was reduced by a certain amount. Rather, Plaintiffs' remediation damages were based on the "reasonable cost of [c]ontamination [c]ontainment." The reasonable cost of contamination containment is, again, a complex and scientific calculation derived from an environmental consultant's recommendation. Because Plaintiffs did not base their remediation damages on the depreciation of their property value, they were not qualified to testify as to such.

Plaintiffs next argue their environmental consultants could testify as lay witnesses regarding the necessity and reasonableness of the vapor barrier. But if Plaintiffs' environmental consultants testified solely as lay witnesses, they could not offer any testimony based on "scientific, technical, or other specialized knowledge." *See* Fed. R. Evid. 701(c). Whether the contamination created a need for a vapor barrier is an inherently scientific and technical question. Thus, Plaintiffs' environmental consultants could not testify as lay witnesses and still establish that the contamination created a need for a vapor barrier. Plaintiffs' argument is therefore without merit.

8

Finally, Plaintiffs contend they need not present expert testimony in their case in chief, and instead, could have rebutted any evidence offered by Defendant that the vapor barrier was unnecessary. We disagree. Plaintiffs bore the burden of proving each element of their trespass claim, including damages. *See Sanderson*, 183 P.3d at 684. At summary judgment, this required Plaintiffs to present admissible evidence showing a genuine issue of material fact with respect to damages. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (explaining summary judgment is warranted if the party who bears the burden of proof cannot "make a showing sufficient to establish the existence of an element essential to that party's case"). Because Plaintiffs did not present any admissible evidence showing the contamination caused the remediation damages, or that the remediation damages were reasonable, Plaintiffs could not withstand summary judgment on their claim for these damages.

In sum, the district court was well within its discretion to conclude that a lay juror would not understand whether the contamination necessitated a vapor barrier. Plaintiffs' three arguments to the contrary are without merit. We therefore hold the district court did not abuse its discretion in requiring Plaintiffs to present expert testimony on their remediation damages. Without expert testimony, the district court properly declined to award remediation damages.

B. Transaction Fees

We turn next to Plaintiffs' claim that the district court erred in striking their transaction fees. Plaintiffs' transaction fees consist of the legal fees incurred during the sale of the Impacted Properties "as a result of Circle K's contamination." These

9

damages include the costs associated with "negotiat[ing] and draft[ing] documents related to the contamination, such as contract amendments and the escrow agreement." The district court declined to award Plaintiffs' transaction fees because Plaintiffs did not plead them as special damages. Whether Plaintiffs' transaction fees must have been specially pled is a question of law we review de novo. *See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014).

Special damages, as opposed to general damages, are those damages which are "the natural, but not the necessary, consequence of the act complained of." *Roberts v. Graham*, 73 U.S. 578, 579 (1867). To put it another way, "[s]pecial damages depend on particular circumstances of the case," while general damages are "the ordinary result of the conduct alleged." *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1266 (10th Cir. 2007); *see also Rodriguez v. Denver & Rio Grande W. R.R. Co.*, 512 P.2d 652, 654 (Colo. App. 1973) (explaining that damages must be specially pled when they "are not the usual and natural consequence of the wrongful act complained of"). Applying this rule to a trespass action, we have held general damages include injury to the land itself. *Weyerhaeuser*, 510 F.3d at 1266. Special damages, on the other hand, will "depend on circumstances unrelated to the trespass, i.e. [Plaintiffs'] plans for the property." *Id.* "If an item of special damage is claimed, it must be specifically stated." Fed. R. Civ. P. 9(g); *see also* Colo. R. Civ. P. 9(g) ("When items of special damage are claimed, they shall be specifically stated."). Failure to plead special damages with the requisite specificity bars recovery of those

10

damages. *See* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1312 (4th ed. 2020).

In this case, Plaintiffs' transaction fees are not the "necessary" or "ordinary" consequence of the trespass.[3] As we explained in *Weyerhaeuser*, general damages— that is, the "necessary" or "ordinary" consequence in a trespass action—include the injury to the land itself. 510 F.3d at 1266. But damages that are more attenuated— like attorneys' fees associated with the sale of the property—are special damages. *See id.* Plaintiffs' transaction fees in this case stem from "circumstances unrelated to the trespass," namely, their negotiations with Trammell Crow to sell the Impacted Properties. *See id.* We therefore agree with the district court that Plaintiffs' transaction fees are special damages which must have been pled with specificity under Federal Rule of Civil Procedure Rule 9(g). Because Plaintiffs failed to plead the transaction fees with the requisite specificity, they are barred from recovering the damages.

C. Lost Opportunity Costs

Finally, we address whether the district court erred in declining to award Plaintiffs' lost opportunity costs. Plaintiffs' lost opportunity costs include the $353,291 in damages "resulting from the delay in the sale of the Impacted Properties due to the [c]ontamination." The district court struck these damages because (1)

---

[3] Although Plaintiffs present no argument on the issue, Plaintiffs' transaction fees are similarly not the "necessary" or "ordinary" consequence of nuisance. *See Lawry v. Palm*, 192 P.3d 550, 569 (Colo. App. 2008) ("[W]hen a party claims it has incurred attorney fees as foreseeable damages arising from a [tort], such fees are considered special damages[.]").

Plaintiffs' disclosure of the damages on the last day of discovery was untimely and (2) the untimely disclosure was not substantially justified or harmless. Plaintiffs challenge the district court's decision on both grounds. That is, they argue their disclosure of the lost opportunity costs on the last day of discovery was timely. But even if the disclosure was untimely, Plaintiffs contend the late disclosure was substantially justified or harmless. We address these issues in turn.

As an initial matter, Plaintiffs argue their disclosure of the lost opportunity costs was timely because the damages were disclosed on the last day of discovery in accordance with "both the Federal Rules of Civil Procedure, and the district court's scheduling order." We are not persuaded. Rule 26(e) requires a party supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e).

In this case, Plaintiffs waited until the final day of discovery to disclose damages they knew (or at least should have known) existed three and a half years prior. To be clear, Plaintiffs' lost opportunity costs stemmed from a six-month delay in selling the Impacted Properties, as Trammell Crow decided how best to remediate the contamination. Even with this delay, however, the sale closed on June 11, 2015. Plaintiffs filed this action a year and a half later, on January 4, 2017. And yet, Plaintiffs did not disclose the damages associated with the delayed closing until nearly two years after that—on December 14, 2018. Plaintiffs cannot seriously contend they supplemented their disclosures in the "timely manner" required by Rule 26(e) when they waited three and half years after the damage occurred, and two years

12

after the litigation began, to disclose the damages. *See Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74, 83 (10th Cir. 2011) (unpublished) (affirming the district court's decision to strike a supplemental report that added 180 pages of new information and was disclosed just eight days before the discovery deadline). We thus agree with the district court that Plaintiffs' disclosure of their lost opportunity costs on the last day of discovery was untimely.

We turn now to whether the district court abused its discretion in concluding the untimely disclosure was not harmless or substantially justified. *See HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1200 (10th Cir. 2017) ("we review the district court's decision to preclude evidence for an abuse of discretion"). If a party fails to disclose or supplement initial disclosures as required by Rule 26(a) or (e), that party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). While "the determination of whether a Rule 26(a) or (e) violation is justified or harmless is entrusted to the broad discretion of the district court," the court should consider several factors in exercising its discretion. *HCG Platinum*, 873 F.3d at 1200 (internal quotations and alterations omitted). Specifically, the court should consider "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or

13

willfulness." *Id.* (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)).

Here, the district court carefully considered each of these factors before precluding Plaintiffs' lost opportunity costs. First, the court found the untimely disclosure created "significant" prejudice or surprise to Defendant. In so holding, the court recognized Defendant had "absolutely no opportunity to question either of the plaintiffs about this lost opportunity cost." The court further found Defendant was prejudiced because it could not retain an expert—which almost certainly would have been necessary—because "not only was the amount of damages not disclosed, but importantly, this entire category of damages was not disclosed until hours before discovery ended." Thus, the court concluded the prejudice to Defendant was significant. And we agree. To add an entire new category of damages—damages nearly twice as much as had previously been disclosed—on the last day of discovery, would have significantly prejudiced Defendant.

Turning to the second *Woodworker's Supply* factor, the court found Defendant likely could not cure the prejudice without re-deposing at least one person and retaining an expert. The court reasoned that redoing depositions and hiring an expert would "necessarily require [the] [c]ourt to vacate the current dates that it has, to reopen discovery for a fairly significant period of time and require the defendant[] to incur significant costs." Thus, while Defendant may have had *some* ability to cure the prejudice, this ability was constrained by costs and court-imposed deadlines. Again, we find the district court did not abuse its discretion in so concluding. While

14

the prejudice could have been cured, to do so would have been both costly and timely.

Next, the court found the untimely disclosure would substantially disrupt the trial. The court explained that permitting the new category of damages would create a "broad reopening" of the case because it would transform the case from a case worth $190,000 and involving issues primarily of remediation, to a case worth almost three times as much with substantially more issues. The district court held this broad reopening of the case would

> certainly require [it] to vacate the final pretrial that is currently set. It would likely require rebriefing on the summary judgment motions that are already out there to the significant expense of everybody involved. And so the potential for trial disruption, while trial has not been set, necessarily there will be a disruption because it is going to vacate the final pretrial. At that final pretrial is when I set the trial date, which I typically set somewhere between three and five months from the final pretrial and that would all be disrupted.

The court recognized that while it had not yet scheduled the trial, the trial would nonetheless be delayed because discovery would need to be reopened and the pretrial vacated. Accordingly, the district court concluded this factor favored preclusion of the evidence. The district court was within its discretion to so decide. Undoubtedly, to reopen discovery to allow for new depositions and retention of a new expert (who would in turn need time to produce a new expert report) would push out the pretrial, and ultimately the trial.

Finally, with respect to bad faith, the district court stated it had "some concerns about the timing of plaintiffs' supplemental disclosures." While the court

15

was unwilling to go so far as to say Plaintiffs acted in bad faith, the court concluded that, "at a minimum," Plaintiffs' actions rose "to the level of willfulness" or "an extreme recklessness." The court held, *at best*, this factor was neutral to both parties. In our view, the district court gave Plaintiffs the benefit of the doubt, as, again, Plaintiffs waited till the final day of discovery to disclose new damages that they knew or should have known about three and a half years prior. In any event, we will not disturb the court's finding.

Given the district court's careful examination of the *Woodworker's Supply* factors—and having reviewed the court's reasoning with respect to each—we conclude the district court did not abuse its discretion in finding Plaintiffs' untimely disclosure of the lost opportunity costs was not harmless or substantially justified. The district court's decision to strike the damages must therefore be affirmed.

II.

For the reasons provided herein, the judgment of the district court is AFFIRMED.

Entered for the Court


Bobby R. Baldock
Circuit Judge

No. 19-1333, *Sonrisa Holding, et al. v. Circle K Stores*

**PHILLIPS**, J., concurring and dissenting.

Like the majority, I would affirm the district court's grant of summary judgment for Circle K against Sonrisa Holding, LLC and Living Trust of Melody L. Ortega ("Sonrisa-Ortega") for the transactional costs and lost-opportunity costs claims. But I would reverse the district court's grant of summary judgment for Sonrisa-Ortega's actual damages, that is, Sonrisa-Ortega's lost sales proceeds (which the majority describes as remediation damages).

In October or November 2013, Sonrisa-Ortega and Trammel Crow began negotiating the sale of Sonrisa-Ortega's commercial property located across the street from Circle K. By March 2014, Sonrisa-Ortega had learned of Circle K's gasoline spill and given permission for a Colorado state environmental-services agency to test for subsurface soil and groundwater contamination under Sonrisa-Ortega's property. By April 2014, the parties to the sale had entered a preliminary sales contract for the property. But Trammel Crow worried about the possibility of vapors from the migrated gasoline making its planned residential development less attractive. So Circle K's gasoline spill endangered the final sale.

At first, Trammel Crow sought a $300,000 reduction in the purchase price to compensate for the property's post-gasoline-spill condition. But they instead agreed on an addendum to the sales contract by which Sonrisa-Ortega would deposit $300,000 into an escrow account for use in abating the risk of gasoline vapors on the property. Trammel Crow then followed the advice of its consultant, Terracon, and constructed a vapor shield,

1

ultimately costing $183,210. Sonrisa-Ortega then reclaimed the balance of the escrow account.

After that, Sonrisa-Ortega sued Circle K for its lost sales proceeds (the cost of Trammel Crow's vapor shield that was funded through the escrow account). Sonrisa-Ortega's position was straightforward: Circle K's gasoline spill caused Sonrisa-Ortega to lose money on its real-estate sale. No one disputes this.

Even so, the district court awarded Sonrisa-Ortega a meager one dollar each in nominal damages for the trespass. It ruled that, to obtain actual damages, Sonrisa-Ortega needed expert testimony that the vapor shield was necessary. The majority agrees. But that ruling puts the brunt of Circle K's gasoline spill on Sonrisa-Ortega and leaves it less than whole. In my view, this runs counter to Colorado law. In particular, two en banc Colorado Supreme Court decisions guide my analysis concerning the damages available to Sonrisa-Ortega and the evidence needed in support.

In *Zwick v. Simpson*, 572 P.2d 133 (1977) (en banc), the Colorado Supreme Court considered a landowner's damages resulting from an adjacent landowner's trespass. *Id.* at 134. Specifically, the plaintiff sought damages from tree-uprooting and flooding caused by the defendant's construction work. *Id.* The plaintiff sought to recover the projected costs of replacing a tree and restoring "the drainage pattern of surface water." *Id.* Before the trial, and before expending these costs, the plaintiff sold the property, leading the defendant to argue that "the proper measure of damages was diminution in the market value of the property as a result of the defendants' actions rather than the cost of restoration and repairs." *Id.* The court agreed with the defendant's position. *Id.* at 134–35.

2

It acknowledged that "market value before and after the injury is ordinarily the rule applied to measure damages to real property." *Id.* at 134 (citations omitted). And it noted that, though "there may, of course, be instances in which repair or restoration cost may be a more appropriate measure," in this case, because the plaintiff had sold the property before the trial and never expended those costs, the actual loss "could only be the amount by which the market value of his property had diminished as a result of defendants' actions." *Id.* (citations omitted).

Almost ten years later, the Colorado Supreme Court decided a similar case, *Board of County Commissioners of Weld County v. Slovek*, 723 P.2d 1309 (Colo. 1986) (en banc). There, a landowner sued Weld County, Colorado, for having negligently allowed river flow to fill the county's gravel pit and then overflow across the plaintiff's property. *Id.* at 1311. Unlike in *Zwick*, the plaintiff was not selling his property, but was instead seeking damages to restore it to its pre-flooded condition, as well as damages for loss of use and enjoyment and for annoyance and discomfort. *Id.* Weld County sought to limit damages to the loss of market value of the property. *Id.* at 1314. The court disagreed, ruling that, in this case, a diminution in market value might not reflect the actual amount of damages that the plaintiff incurred, because he had testified that he remained on the property and had lost fishing and other recreational enjoyments. *Id.* at 1311.

Citing *Zwick*, the court explained that "the goal in compensating the property owner is to reimburse that owner for the actual loss suffered." *Id.* (citations omitted). In this regard, the court commented, "the law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort." *Id.*

3

(quoting Restatement (Second) of Torts § 901 cmt. a (Am. Law Inst. 1979)). Though recognizing the traditional rule that loss of market value sets the measure of damages, the court quoted the Restatement (Second) of Torts § 929(1)(a) for the proposition that "the property owner should be allowed to choose as the measure of damages either the diminution of market value or 'the cost of restoration that has been or may be reasonably incurred.'" *Id.* at 1315. The court then listed Restatement factors under which a landowner may pursue broad damages, even beyond reduced market value and restoration costs. *Id.* But the court cautioned trial courts against relying on restoration damages as the measure of damages when a plaintiff had sold rather than restored his property. *Id.* at 1317. In sum, the court advised that damages should "achieve the cardinal objective of making the plaintiff whole." *Id.*

As I read these two cases, they instruct courts to use a measure of damages for injured landowners that considers the landowner's intended use of the property and seeks to compensate the landowner for the damages actually suffered. When property is sold, as in *Zwick*, that measure will ordinarily be the property's loss of market value. Here, Sonrisa-Ortega seeks exactly that. To show this loss of value, Sonrisa-Ortega offered something better than appraisals—it offered the agreement of live parties with cash on the barrelhead. Sonrisa-Ortega was ready, willing, and able to show the reduced market value of its sold property by simple mathematics—the total sales proceeds with and without the vapor guard installed in connection with Circle K's gasoline spill. Had the parties to the sale never sought a vapor shield—but instead reduced the sales price from the buyer's fears about the gasoline in the groundwater beneath the anticipated residential

4

development—Sonrisa-Ortega could have claimed that amount as damages. Proceeding with the escrow account for the vapor guard should make no difference. The two situations are functionally equivalent.

The evidence that Sonrisa-Ortega offered in support of compensatory damages sufficed under Colorado law to defeat summary judgment. At trial, Circle K could have presented evidence, if it had any, that other buyers stood ready to buy the multi-million-dollar real estate without a vapor guard or at the original sales price. I cannot say that Sonrisa-Ortega somehow acted unreasonably by accommodating its buyer's concerns about the gasoline spill to "literally save[] the deal." App. at 994 ¶ 6. Punishing Sonrisa-Ortega for Circle K's gasoline spill is unfair and runs counter to Colorado law, which favors reimbursement of actual losses.